# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

AARON NORMAN DUNN,
Defendant and Appellant.

S184521

Sacramento County Superior Court
06F02731

July 24, 2025

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Liu, Kruger, Groban, Jenkins, and Evans concurred.

PEOPLE v. DUNN

S184521

Opinion of the Court by Corrigan, J.

High on methamphetamine and angry over the breakup of his marriage, defendant Aaron Norman Dunn sped down a busy Elk Grove street one Saturday evening and shot bystanders with a 12-gauge shotgun. He killed two men, injured two others, and engaged in a shootout with the police. He was convicted of two counts of murder and five counts of attempted murder, with a multiple-murder special circumstance and enhancements for the personal and intentional discharge of a firearm.[1] The jury fixed the penalty at death. The court denied defendant's motions for new trial and modification of the death verdict. It stayed two additional sentences of life with parole plus determinate terms totaling 45 years to life in prison. We affirm the judgment.

---

[1] Penal Code sections 187, subdivision (a), 644, subdivisions (a), (e), 190.2, subdivision (a)(3), 12022.53, subdivisions (c)–(d). He was acquitted of three additional attempted murder counts: two by the court on an unopposed motion (Pen. Code, § 1118.1), and one by the jury's verdict. All further statutory references are to the Penal Code unless otherwise specified.

# I. BACKGROUND

## A. *Guilt Phase*

### 1. *Prosecution Evidence*

#### a. *Defendant's Depression and Escalating Drug Use*

After defendant and his wife, Sara Pack, separated in August 2005, Pack and their young daughter went to live with Pack's parents in Yuba City. Defendant began abusing methamphetamine. He lost his home and was fired from his job. He drifted around, sometimes sleeping in his car or motels, and eventually went to stay with his uncle, Ernie Palacio, in Olivehurst. Palacio had long used methamphetamine, and he supplied defendant with large amounts of the drug.

Defendant learned that Pack had been dating Brian Clauson and Keith Berry, who both lived in Elk Grove. Berry was a Stockton police officer. Defendant resented these relationships and complained to friends that "his wife was cheating on him with cops." In late November 2005, defendant called Berry and confronted him about dating Pack, angrily asking if Berry knew the Hank Williams song "Roasting the Pig." Around the same time, defendant also spoke on the phone with Clauson and implied that he knew where Clauson lived. Another time, while impersonating Pack in an online chat, defendant told Clauson, "You'd better kiss your babies goodnight." Clauson understood the remark as a threat to his children and briefly stopped seeing Pack. They resumed their relationship, however, and on the night of the murders Pack was at his apartment.

On Saturday, March 25, 2006, defendant babysat his sister's children, although he seemed to be under the influence of methamphetamine. He was distant and seemed anxious to

leave. He called Pack, seeking access to the couple's storage unit, but she refused. He went to his uncle's home, where Palacio and some friends were having a barbecue. There, he injected a large amount of methamphetamine and began carrying around a Winchester 12-gauge shotgun that his friend Kevin Rhoades had stored in Palacio's trailer. Defendant gave Rhoades the keys to a storage unit and said he could take anything inside, including a Mossberg shotgun that was stored there. Defendant took Rhoades's Winchester and left the barbecue, saying he "had to go handle business."

About 7:00 p.m., defendant left Olivehurst. He called his friend Brad Allen from the car, saying he was leaving town. He said Allen had "been a good friend" and asked him to tell his kids goodbye. He did not sound distressed or intoxicated. Before hanging up, he told Allen, " 'Just watch the news tonight.' " Next, defendant called his sister. He left a voicemail saying he loved her and had "loved everybody, always, to the end." He made several other rambling phone calls to Pack during the drive. In one call, he said someone was "giving him weird looks" and people were speaking in code. In another, he said he'd been in a fight with two people, that there was " 'nothing left,' " and it was "too late" for them as a couple. He repeatedly asked to speak with their daughter, saying he wanted her to know he loved her and he hoped Pack would " 'find a good father figure for her.' " About 15 minutes later, he called again and said he'd just killed two or three "drug people" in Marysville. Pack urged him to turn himself in, but defendant responded, " 'It's too late for all that.' " He told Pack, "You're gonna have to live with this for the rest of your life."

At 7:48 p.m., defendant left Pack a five-minute voicemail. In the message, which was played for the jury, defendant shouts

"Woo!" as rock music plays in the background. His exclamation is followed by the sounds of a car crashing, sirens, and repeated gunshots.

### b. *Shooting of Michael Daly*

Mike Daly and his extended family had spent the evening celebrating his mother's birthday at a Chili's restaurant in Elk Grove. Afterward, Mike got in his car and prepared to leave.[2] Mike drove, with his wife Roberta in the passenger seat and their two children, ages three and six, strapped into rear car seats.

It was 7:41 p.m., and traffic was fairly heavy as Mike waited to turn right from the parking lot onto Laguna Boulevard. Suddenly, there was a loud noise and the car filled with a strong smell of gunpowder. The driver's side window was shattered. Mike slumped over the steering wheel, blood pouring from his head. He had been shot in the face. Roberta pulled the emergency brake to keep the car from rolling into traffic, then jumped from the car screaming for help. She had noticed nothing unusual before the shot was fired.

A patrol car pulled up behind the Dalys' car. A community service officer with the Elk Grove Police Department had heard a loud "bang" while backing out of a parking stall and stopped to investigate. Roberta ran to the officer for assistance. Additional officers soon arrived, helped get the children out of the car, and secured the scene.

Meanwhile, others from the Daly family were still in the area. Mike's 16-year-old niece left the restaurant, saw Roberta

---

[2]     When family members share a last name, we refer to them by first names for clarity.

in distress, and ran to get her mother. Mike's sister Maureen rushed to the scene and told officers she knew first aid and could assist. Mike's appearance was shocking. There was a three-inch hole in his cheek, and his eyes bulged from their sockets. But, detecting a strong pulse, Maureen acted to staunch his bleeding. At the hospital, he was treated for "devastating injuries to the bones of the face and the mouth," massive hemorrhaging, and severe injuries to both eyes. Unable to breathe on his own, he suffered seizures caused by brain swelling. He died four days later.

### c. *Threats and Shooting at Bystanders*

People traveling on Laguna Boulevard near Chili's noticed a car speeding and weaving aggressively through traffic. Witnesses saw defendant driving while holding a shotgun out the open driver's window. Without slowing, he approached several cars stopped at a traffic light. One was the marked patrol car of Elk Grove Police Officers Tisha Smith and Janell Bestpitch. Defendant pulled alongside, leaned out his window, and fired, shattering the patrol car's rear passenger window and the interior Plexiglass partition. Almost immediately afterward, he crashed into a truck that was stopped at the light.

Believing she and her partner were under attack, Officer Smith maneuvered around stopped traffic and drove away. Defendant jumped from his car and grabbed the shotgun. Without a word, he made eye contact with the occupants of a car that had stopped behind the police cruiser and pumped his shotgun. He aimed at passenger Adam Wheeler and fired through the windshield. Wheeler ducked and grabbed the head of the driver, Stefanie Cartwright, pulling her down as the windshield shattered. He told Cartwright to "punch it." She

swerved around defendant and sped away. A sliver of glass pierced Wheeler's cornea and was removed at the hospital.

After shooting at Wheeler, defendant ran in place and raised the shotgun overhead with both hands, signaling "victory." He then walked toward another stopped car. He stared at the driver, pumped the shotgun, and raised it to shoot. The terrified driver ran a red light and fled. Defendant then ran toward a restaurant called Mandango's.

### d. *Shooting of Jon Johnson*

Karen and Jon Johnson had finished dinner at Mandango's and walked outside. Karen got in their car while Jon stood outside taking a phone call. Defendant ran into the parking lot, still holding the shotgun. Karen heard Jon say, in a joking tone, " 'Man, get that out of my face.' " Then she heard a loud "pow" when defendant shot Jon in the face. After Jon fell, defendant "strutt[ed]" behind the car, holding his arms up in a "V" posture for "victory." When he looked in Karen's direction, she ducked, and he walked away. Karen found Jon bleeding on the ground. His face was nearly obliterated. She ran back into the restaurant screaming for help. Jon was rushed to the hospital but died later that night.

### e. *Shootout with Police and Defendant's Apprehension*

Less than a minute after driving away from the intersection, Officers Smith and Bestpitch heard a radio dispatch about the Daly shooting and sped back to the scene. There, they saw that defendant's car had crashed into a truck. Officer Smith got out of the car with her gun drawn and instructed Officer Bestpitch to draw her weapon and stay down.

Bystanders yelled and indicated that defendant had gone toward the Mandango's parking lot. Officer Smith initially saw no one, but someone yelled, " 'He's behind you. He's got a shotgun.' " She turned and saw defendant shift the shotgun from the patrol car and point it directly at her. Smith pointed her weapon, stepped toward defendant, and ordered him to drop the shotgun. He kept looking at her but did not lower the gun. Smith fired two or three shots at his chest. When he did not react, she stepped closer and fired again. His body jerked but he did not drop the gun.

Defendant ran toward the patrol car, brandishing the shotgun. Officer Bestpitch had been interviewing witness Vincent Marconi. They took cover behind the car when they heard shouting and shots fired. Defendant reached the car, chased them in circles around it, and shot Marconi in the back. Marconi was able to run away and was later treated for several penetration wounds. Fourteen steel pellets could not be removed and remained in his back.

Officer Bestpitch and defendant faced off at gunpoint across the patrol car's trunk. Bestpitch fired four rounds. Defendant fell to the ground but still held up the shotgun. When Officer Smith ordered defendant to show his hands, he turned the gun on her. Smith ordered Bestpitch out of her line of fire. When defendant again ignored her commend to drop his weapon, Smith shot him twice. He slumped to the ground, falling on the shotgun.

The shotgun was secured, and defendant was taken to the hospital. He had been shot six times and was given 17 units of blood. After this transfusion, his blood still tested positive for alcohol and methamphetamine.

### f. Investigation

The shotgun was identified as belonging to Kevin Rhoades. Police recovered several shells from defendant's car, along with expended shells from the Mandango's parking lot and Laguna Boulevard. No shells or related materials were found at the Chili's site, but a shotgun wad was found embedded in Daly's wounds. Two cell phones were found in defendant's car, one displaying the banner "GFDDALLPIGSDIE." A substance containing Daly's DNA was recovered from the car's passenger side mirror.

A guard was posted to sit in defendant's hospital room after the shootings. Defendant drifted in and out of consciousness. When a nurse came in, the officer spoke to her, asking if defendant had been under the influence of narcotics or alcohol when he was admitted. Defendant interjected, " 'I was on methamphetamines,' " then volunteered, " 'I knew what I was doing that night.' " While the nurse changed his dressings, defendant said, "I just don't want to live."

Pack visited defendant once in jail. During their recorded conversation, defendant told her, "I could have got two more, but I didn't 'cause they were women." She responded that he shouldn't say such things, and he said, "No. I'm just saying. I might have been a little, uh, over the edge, but I wasn't — [¶] . . . [¶] — totally."

### 2. Defense Evidence

A pair of eyeglasses was found on the floorboard of defendant's car. An optometrist estimated that defendant's vision was approximately 20/400 without correction. Without the glasses, someone with this level of impairment would have

difficulty perceiving specific features but would still be able to recognize the human form beyond 10 feet.

Psychiatrist Douglas Tucker was called as an expert in "substance abuse and dual diagnosis." Based on witness reports and defendant's blood-alcohol level, Dr. Tucker deduced that at the time of the shootings defendant was intoxicated with alcohol and methamphetamine. He believed defendant was "suffering from a meth[amphetamine]-induced psychotic disorder." He was depressed, suicidal, and sleep deprived on the night of the shootings. Dr. Tucker described him as being "frantic," with "high adrenaline," and in "self-defense mode." Tucker opined that defendant had the "delusional belief" he was under attack from the police, which caused him to shoot at the patrol car. He could not see clearly because he had lost his glasses, adding to his disorientation. He approached various people to see if they were attacking him. When Johnson "looked aggressive and mean" and ordered him to point the shotgun somewhere else, defendant perceived him as threatening and shot him. Tucker also described defendant's emotional reaction to the breakup of his marriage and the losses of his job, home, and relationship with his daughter. A week before the incident, his cousin had also died. He coped with these losses by injecting methamphetamine. In Tucker's view, defendant's fist pumps and shouts of " 'woo' " during the shootings indicated he was "in a battle mode." They signified not enjoyment but relief that he had survived encounters with his attackers. Tucker dismissed defendant's statement that he knew what he was doing as inconsistent with Tucker's characterization of his mental state and behavior. On cross-examination, Tucker conceded that defendant has antisocial traits but said he could not diagnose

antisocial personality disorder because those traits could be caused by defendant's severe alcohol and drug addictions.

David Buckley testified that defendant approached him at Palacio's barbecue. Defendant was agitated and said he knew the men had been "talking code about him." When Buckley laughed off the remark, defendant threw a punch at him and the two "got in a little scuffle." Palacio broke up the fight and asked his nephew what was wrong. Defendant repeated that all the men had been "talking code" about him, then got in his truck and drove off. Buckley did not think defendant seemed high, nor did he appear to have been awake for days on a drug binge.

Nancy Castillo described defendant's emotional state after the breakup of his marriage. Defendant drank more than a case of beer each day and began injecting methamphetamine. One night, about a week before the shootings, he ran through a field to her back door and claimed the police were chasing him. "He looked like he had been up for days" using drugs, and his personality had changed. He also looked tired on the morning of the shootings but did not say he thought "everybody was a cop."

## B. Penalty Phase

### 1. Aggravating Evidence

#### a. Other Misconduct

The prosecution presented evidence of defendant's involvement in a number of fights, some of which occurred while he was in custody for the present offenses.

In 1993, he and three friends followed a boy home from their high school. Defendant and one boy threw rocks at the victim's head. Defendant and another boy punched the victim, and defendant repeatedly kicked him in the head as he lay on

the ground. Defendant jeered, " 'What's up? Come on punk.' " The victim suffered bruising, a cut lip, and a chipped tooth. Later, he heard rumors that defendant "was out to get him."

In 2005, after defendant fought with another patron at a Yuba City bar, a group of bouncers ejected them. When the combatants tried to reenter, a bouncer blocked their path. Defendant and the other patron rushed the bouncer, held him down, and punched him repeatedly in the face, back, and ribs. Defendant seemed to be the instigator, with the other patron following his lead.

In April 2008, while held in the Sacramento County jail for the murders, defendant was part of a group of six White and Hispanic inmates who attacked three Black inmates. When one inmate fled, defendant chased him down, put him in a headlock, and repeatedly punched him in the head. He ignored commands and did not relent until deputies entered the pod.

In November 2008, deputies found what appeared to be an improvised weapon in defendant's cell. The item was a plastic bag the size of a fist packed tight with dampened newspaper forming a hard ball and tied off with a foot-long string.

Defendant was involved in another jail fight in April 2010, during the penalty phase of trial. He ran up a set of stairs and attacked another inmate from behind, punching him with closed fists until deputies stopped the fight. Defendant was not wearing his glasses during the encounter.

### b. *Victim Impact*

Maureen and David Daly described their brother's life and interests. Mike Daly was the sixth of seven children. He was a star hockey player and had been offered a four-year hockey scholarship, but he turned it down to attend the University of

Notre Dame, graduating with a degree in philosophy. He met his wife Roberta while she was visiting the country on vacation from her home in Rome. They married after a brief long-distance relationship. Their first child was born when they lived in the Netherlands. In 2002, they moved to Sacramento and had a second child. Mike enjoyed spending time with his extended family and hosted a dinner for them weekly. He enjoyed cooking, taking care of his family, and coaching his son's soccer team.

Mike's mother did not want him to go to the trouble of cooking for her, so the family decided to celebrate her 87th birthday at a restaurant. Mike, Roberta, and their two young children were joined by Mike's mother, his brother David, David's wife, his sister Maureen, and Maureen's 16-year-old daughter. After the shooting, Maureen called David, who had left earlier with their mother and his wife. They drove together to the hospital where Mike had been taken. They were inconsolable. All of Mike's siblings flew into town, and someone was constantly at his bedside. Before Mike died, David spent an hour playing him a series of songs that were special to them. The last song was one called "Horizon," which Mike had written and performed.

Mike was kept on life support for five days, which was frustrating for Roberta because she knew he would not want to live in that condition and had wanted to donate his organs. After he died, Roberta immediately sold the couple's house and moved back to Rome with the children. She did not want to live in this country anymore, even though she was close to obtaining a permanent visa for citizenship. Their older child attended counseling and for about six months and kept drawing pictures of what happened the night his father was killed. He was often

sad seeing other children at the park with their fathers. Maureen and her daughter also received counseling.

Jon Johnson was one of 13 siblings. After graduating from high school in Oakland, he initially pursued a forestry degree at Chico State University, then built a career in telecommunications. He worked as a cameraman for a local news station, frequently covering Sacramento Kings games. Jon loved children and in 2004 founded an organization to help foster children find families.

Jon was on the phone with his close friend Dewayne Witherspoon moments before he was shot. Witherspoon heard Jon tell defendant to "get that [shotgun] out of my face" just before the line went dead. About an hour later, Witherspoon drove by and noticed a large police presence on Laguna Boulevard. He became worried about Jon and called to check in but never received a call back. When a friend called later that night telling him Jon had been killed, Witherspoon screamed and dropped to his knees. He was "completely ineffectual" at work for the next month. Many of Jon's family members learned about the shooting while gathered at his sister's house in Berkeley. They turned on the local news and were stunned by reports that Jon had been shot. The family waited several days to inform Jon's elderly mother, who was in poor health. Upon hearing the news, she dropped her head and asked, " 'God, why him? You should have took me. He didn't deserve this.' "

After the shooting, Jon's wife Karen ran into the restaurant screaming and crying uncontrollably. She was haunted by the "terrible" wound she had seen to his face. She was like a "zombie" for days, unable to eat or sleep. A therapist treated her for posttraumatic stress disorder for six months.

She could not work for a year. She hated Sacramento but could not move because her son had only three months left of high school. Although her son had wanted to go to college in Alabama, Karen could no longer afford to send him. After Jon died, she lost their house to foreclosure. Jon's daughter had been at college in Colorado. Without her father, she had to drop out of school so she could work fulltime.

Officer Bestpitch also testified about the crimes' impact. She had only been on patrol for about six months when the shootings happened. She had difficulty sleeping afterward and was unable to work in the field by herself for about two months. The first time she tried to do so she froze and was unable to operate the squad car. Once she was driving off duty with helium balloons in the car. When one popped, she panicked and could no longer drive because the sound "brought back everything." Another time she was frightened when someone threw a bottle at her patrol car. Although she had seen a department counselor, she was trying to "tough this out."

### 2. *Mitigating Evidence*

Defendant's parents, Sandra Adams and Tom Dunn, began dating when Sandra was 16 and Tom was 21 years old. They married two years later, and after another two years moved from Marysville to Canada so that Tom could attend school. Defendant was born in Canada in 1977. He was five months old when they moved back to California. The family lived in Crescent City for three years, then returned to Marysville. By that time, defendant had a younger brother, Patrick, and sister, Sarah.

Tom held many jobs during these years but eventually became a bus driver. He drank heavily, used marijuana,

collected pornography, and was unfaithful to the marriage. He was uninvolved in the children's lives and abused them verbally and physically. As punishment for some minor infraction, he once made the children throw away all their toys. He made defendant and his brother drink alcohol and encouraged all the siblings to fight with each other and neighborhood children. During this time, defendant grew close to his grandfather, Norman Dunn, who was very involved with the family. Norman was a controlling and domineering man who did not show his emotions. Defendant learned to conduct himself in the same way.

When Norman died in 1989, the family began to fall apart. Tom inherited some money but quickly spent it. He started using heroin and brought a prostitute to the house. Fed up, Sandra moved out with Sarah but left defendant and his brother to live for several months with Tom and Tom's elderly mother. Defendant was 11 and his brother was nine. During this time, Tom sold nearly all the furniture and appliances, leaving the house cold and dark. There was little food. Tom sometimes took the boys with him when he purchased drugs, which he injected in their presence. Tom later served time in prison for stealing from his mother's estate.

After four or five months, Sandra brought the boys to live with her and Sarah. Sometimes Sandra's brother, Ernie Palacio, also stayed with them. Defendant had lost interest in school and sports. He drank and smoked marijuana with his friends and spent substantial time with Palacio, who also used drugs. By the time defendant was 16 years old, he was using methamphetamine and getting into fights. He was sent to the California Youth Authority.

Upon his return, defendant resumed using drugs and met Pack through two neighbors who made methamphetamine. After they started a relationship, defendant seemed to mature and become a "family man." He was happy when his daughter was born and helped care for her. He stopped using drugs and drinking heavily and was employed as an electrical installer. But about five years later, defendant's relationship with Pack deteriorated. He resumed drug use and was fired from his job, becoming depressed and withdrawn. On the day of the shootings, he told his mother he had been using "too many drugs."

Even when his life went downhill, defendant was kind to his family and stayed involved in the lives of his nieces and nephews. He remained close to his siblings, giving them emotional and financial help. His mother and siblings testified that they loved defendant and did not want him to receive the death penalty. A death sentence would also be painful for his nephews and daughter.

Psychologist Gretchen White compiled a psychosocial history. She described a significant history of drug and alcohol abuse, patterns of paternal aggression and abandonment, and maternal passivity. In her view, these experiences made defendant "especially vulnerable" to the losses he experienced before the shootings. By adolescence, these family patterns led defendant to develop four significant traits: strong attachment to family; a paternal role with siblings; strong work ethic; and dependence on drugs and alcohol. He was very depressed in early 2006 by the loss of his marriage and job, but when he tried indirectly reaching out to his mother she did not offer help. All of his losses snowballed into despondency, intensified drug use, and paranoia.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Venue*

Defendant contends the court abused its discretion and violated his rights to a fair trial and impartial jury by denying his motion to change venue or exclude jurors from Elk Grove due to "extensive, inflammatory and prejudicial pretrial publicity." The claim fails. He has established neither error nor prejudice.

#### a. *Background*

Before trial, defendant moved to either change venue or exclude all Elk Grove residents from the jury. He pointed to 24 articles in the Sacramento Bee and Elk Grove Citizen, about half of which appeared on the front page or front of an interior section. There had been 478 television broadcasts about the case across several stations. According to defendant, much of this coverage was "inflammatory," describing the crimes as a " 'rampage,' " " 'spree,' " or " 'tragedy,' " and using adjectives such as " 'deadly,' " " 'chaotic,' " and " 'random.' " Community reaction was described with the words " 'shocked,' " " 'stunned,' " " 'hysterical,' " and " 'scared.' " Newspaper articles included 14 references to the death penalty. Elk Grove held a town hall meeting to discuss the shootings, and a fundraiser was organized to assist the victims' families. In supplemental papers, defendant offered further argument for removing Elk Grove residents from the jury pool but pointed to no case law authorizing this action. He asserted that similar regional exclusions occur in counties that use a "bulls-eye method" of

summoning jurors from the region closest to the courthouse where a case is tried.[3]

Defendant's expert, Professor Edward Bronson, submitted supporting declarations. Based on his review of pretrial publicity, Dr. Bronson could not definitively conclude that a change of venue would be required. Nevertheless, he was of the "firm opinion that excluding Elk Grove residents from the jury pool would be an adequate protection for" defendant's constitutional rights, and this safeguard would avoid the need for a costly and time-consuming community survey. He further maintained that individualized, sequestered voir dire was necessary, at least for prospective jurors who expressed familiarity with the case.

In December 2009, the court held a two-day hearing on the motion. Dr. Bronson testified that his review encompassed 32 newspaper articles about the case. Bronson conceded this was "not a large amount," but it was more than in some other Sacramento cases in which a venue change had been granted. The heaviest publicity occurred in 2006, encompassing 19 articles. Nine more articles appeared in 2007, one in 2008, and a final three in 2009, leading up to the trial. Bronson characterized the coverage as inflammatory, using words such as "rampage" and "spree." Readers would find the crimes especially salient because they were unprovoked and occurred in familiar surroundings. Bronson opined that even Elk Grove

---

[3] It appears this method is used in some geographically large counties to avoid requiring jurors to commute long distances to trial each day. Under the method, jurors are called from an area near the courthouse where they will be asked to serve.

residents not directly affected would feel that the crimes could have happened to them. Bronson did not know if the articles exposed potential jurors to any inaccurate or inadmissible evidence, but readers could have encountered "powerful victim impact evidence" and mentions of defendant's incriminating statement to investigators. The stories were "pretty one-sided." They strongly suggested defendant had committed premeditated murder because he was angry at the police and upset that his life had fallen apart. He was "demonized," photographed shackled and wearing an orange jumpsuit, and portrayed as an "outsider" to the local community. By contrast, the victims, although not nationally prominent, were very sympathetic. Johnson was well known to the media through his reports on the Sacramento Kings. The community responded to his murder with memorials and a moment of silence at the Arco Arena. Television coverage was similar to that in the newspapers. It was more vivid but also more remote in time, with most broadcasts airing near the event itself. Though Bronson had counted 478 broadcasts, he did not track how many were short "teaser[s]" for upcoming news shows. Overall, Bronson believed the pretrial publicity called for "a change of venue or some other remedy, such as . . . individualized and sequestered voir dire."

At the time of the hearing, Sacramento was the eighth largest county in California, with a population of over 1.4 million. Bronson conceded that the county's large size did not support a change of venue, but the City of Elk Grove's population was only 141,430. If Elk Grove were its own county, it would rank 34th in population. Bronson stated that crimes have a greater impact in small communities like Elk Grove, and jurors from that region were more likely to be "contaminated"

by negative press coverage than those from other parts of Sacramento County.

Dr. Bronson further testified that, after the parties had failed to reach a compromise on venue or the exclusion of Elk Grove jurors, he commissioned a "small scale survey" to explore whether a venue change was needed. He surveyed jury-eligible individuals in 426 households, comprised of 151 Elk Grove residents and 275 residents from elsewhere in Sacramento County. Only 54.5 percent of the broader Sacramento County respondents recognized the case, as compared with 83.6 percent of Elk Grove respondents. Among those who had heard of the case, 84.1 percent of Elk Grove respondents and 87.9 percent of respondents from elsewhere in Sacramento County thought defendant was guilty. Regarding the appropriate sentence, 53.6 percent in Elk Grove and 54.3 percent elsewhere in the county believed defendant should receive the death penalty, whereas only 34.8 percent and 32.9 percent, respectively, thought life imprisonment without the possibility of parole was appropriate. In response to open-ended questions about the crimes, many mentioned defendant's guilt and the appropriate punishment. Some Elk Grove residents discussed fear in the community, the randomness of the crimes, and the innocence of the victims.

Dr. Bronson's review of the pretrial publicity and survey results led him to conclude a venue change "[o]r some other appropriate remedy" was needed to ensure a fair trial. In particular, he recommended using a detailed juror questionnaire, employing open-ended questions in both the questionnaire and voir dire, and conducting individualized, sequestered voir dire touching on the death penalty and pretrial publicity. He believed there was a "very high" risk that defendant would not receive a fair trial with Elk Grove residents

on the jury. On cross-examination, Bronson agreed that of the 125 other cases in which he had testified about venue, 99 had more newspaper articles and 121 had higher recognition percentages than in defendant's case. He confirmed that, while he did not think a venue change would be inappropriate, he was *not recommending* a change of venue here. Instead, he recommended safeguards such as enhanced voir dire.

The court declined to change venue. It observed that published cases have analyzed venue based on the size of the entire county, even though publicity is often more intense in the specific area where the crime occurred. Because such a small percentage of Sacramento County's population lived in Elk Grove, the court agreed with Dr. Bronson that it was not necessary to move the case out of the county. Instead, the court planned to adopt some of the safeguards Bronson had suggested. In particular, the court would allow the attorneys to question prospective jurors directly and would not otherwise limit voir dire. The court would permit "a rather lengthy questionnaire" and encouraged the attorneys to draft open-ended questions, as Bronson had recommended. It would also allow panelists who had received information about the case to be questioned individually and outside the presence of other panelists. The court denied defendant's request to exclude all panelists from Elk Grove, however, noting that no legal authority had been offered to support this "novel" proposal.

### b. *Analysis*

As a preliminary matter, the Attorney General contends defendant forfeited his venue challenge. When a change of venue motion is initially denied without prejudice, the defendant must renew the motion after voir dire to preserve the

issue for appeal. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1076 (*McCurdy*); see *People v. Johnson* (2015) 60 Cal.4th 966, 982 (*Johnson*).) Here, though the court did not expressly state that its ruling was without prejudice, it observed that it found no need for a venue change "at the present time." Defendant did not renew his venue motion at the close of voir dire, but defense counsel *did* object to the jury as composed. Assuming this objection was sufficient to preserve the claim, we conclude it lacks merit.

On a defendant's motion, the court must order a change of venue when "there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a); see *Maine v. Superior Court* (1968) 68 Cal.2d 375, 383.) "The phrase 'reasonable likelihood' in this context 'means something less than "more probable than not," ' and 'something more than merely "possible." ' " (*People v. Proctor* (1992) 4 Cal.4th 499, 523 (*Proctor*).) Over time, courts have developed a series of considerations to weigh when addressing the question. (See *People v. Peterson* (2020) 10 Cal.5th 409, 439.) " 'The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim.' " (*Ibid.*)[4] "On appeal, the defense bears the burden of showing both error and prejudice. It must establish a reasonable likelihood both that a fair trial could not be had at the time of the motion, and that the

---

[4] " 'Political overtone' factors, if present, may also be a pertinent consideration." (*People v. Scully* (2021) 11 Cal.5th 542, 567 (*Scully*).) Because defendant does not argue the case was politicized, we do not analyze this factor.

defendant did not actually receive a fair trial." (*People v. Smith* (2015) 61 Cal.4th 18, 39 (*Smith*); see *McCurdy*, *supra*, 59 Cal.4th at p. 1080.) "We accept the trial court's factual findings if supported by substantial evidence, but independently review the court's determination as to the likelihood of a fair trial." (*Smith*, at p. 39.)

As to the nature and gravity of the offense, we have repeatedly acknowledged that "every capital case presents a serious charge. This factor adds weight to a motion for change of venue but is not dispositive." (*Proctor*, *supra*, 4 Cal.4th at p. 524; see *Smith*, *supra*, 61 Cal.4th at p. 40.) The allegations here were certainly unsettling, "[b]ut the disturbing facts inherent in most capital murder cases standing alone do not require a change of venue." (*McCurdy*, *supra*, 59 Cal.4th at pp. 1076–1077.) " 'Indeed, on numerous occasions we have upheld the denial of change of venue motions in cases involving multiple murders' " and other sensational facts. (*People v. Duong* (2020) 10 Cal.5th 36, 47–48; see, e.g., *id.* at pp. 42–43; *Smith*, at pp. 23–25, 42–43.)

The nature and extent of pretrial publicity do not weigh in favor of a venue change. Defendant presented evidence of 32 newspaper articles, far fewer than in other cases where denial of a venue motion was upheld. (See, e.g., *People v. Ramirez* (2022) 13 Cal.5th 997, 1037 (*Ramirez*) [244 articles]; *People v. Famalaro* (2011) 52 Cal.4th 1, 22 (*Famalaro*) [289 articles].) Most were published shortly after the crimes, which happened three years before the venue hearing and nearly four years before jury selection began. As we have repeatedly observed, the passage of time blunts the prejudicial impact of negative publicity. (See *Ramirez*, at p. 1038; *People v. Johnsen* (2021) 10 Cal.5th 1116, 1147 (*Johnsen*); *People v. Rountree* (2013) 56

Cal.4th 823, 838 (*Rountree*).)  According to Dr. Bronson's survey, only 54.5 percent of Sacramento County residents recognized the case, a rate significantly lower than in other cases in which we have upheld the denial of a venue change.  (See, e.g., *Scully*, *supra*, 11 Cal.5th at p. 564 [83 percent]; *People v. Harris* (2013) 57 Cal.4th 804, 823 (*Harris*) [72 percent]; *Rountree*, at p. 836 [81.4 percent].)  In light of these numbers, defendant's own expert was not willing to opine that a change of venue was required to ensure a fair trial.

It is true that the recognition rate was higher (83.6 percent) among respondents who lived in the small community of Elk Grove.  For this reason, Dr. Bronson recommended excluding Elk Grove residents from the venire. Defendant offered no authority for employing such a remedy, and the trial court expressed concern over the "legality" of the procedure.  On appeal, defendant has renewed his argument that the exclusion of Elk Grove jurors was required but again cites no legal authority supporting this procedure.  We conclude the trial court was in the best position to determine whether this purported solution was appropriate in light of the evidence presented.  (See *Skilling v. United States* (2010) 561 U.S. 358, 386 (*Skilling*).)  Given the lack of authority cited for defendant's request, the likelihood that few Elk Grove residents would be seated, the statistical evidence of their beliefs as compared to other Sacramento residents,[5] and the other ameliorative strategies the court adopted, its refusal to blanketly remove all

---

[5]    We note that, according to percentages in the defense survey, when compared to broader Sacramento County residents, fewer Elk Grove residents believed defendant was guilty, fewer thought the death penalty was appropriate, and more thought life imprisonment without parole was called for.

Elk Grove residents from the venire was well within its discretion.

In addition to the amount of pretrial publicity, the court must also consider the nature of the coverage. Defendant contends the news reports were inflammatory because they described the shootings with words such as "deadly," "rampage," and "spree," but these terms accurately depicted defendant's conduct. "Media coverage is not biased or inflammatory simply because it recounts the inherently disturbing circumstances of the case." (*Harris, supra*, 57 Cal.4th at p. 826.) The content of articles in the record was largely factual, conveying details about the crimes along with defendant's prosecution and trial. While some articles described community outrage and the distress of victims' families, these subjects are commonly addressed in press coverage of a murder and it is hardly surprising that such views would be held. Further, though media reports suggesting a party's guilt or conveying inadmissible facts may give rise to prejudice (see *Johnsen, supra,* 10 Cal.5th at pp. 1147–1148; *Williams v. Superior Court* (1983) 34 Cal.3d 584, 592), here there was no dispute that defendant committed the shootings, and he has identified no inadmissible matter conveyed in the press coverage (compare *People v. Lewis* (2008) 43 Cal.4th 415, 449). On balance, the nature and extent of pretrial publicity did not weigh heavily in support of changing venue. (See *id*. at p. 449 [articles and broadcasts describing community's shock at the " 'execution-style' " killing of random victims in a " 'rampage,' 'cold-blooded,' 'spree of terror' " did not require a venue change].)

The size of the community did not support changing venue. With over 1.4 million residents at the time of defendant's motion, Sacramento County was the eighth most populous

county in California. "In a populous urban area, a major crime is less likely to remain imbedded in the public consciousness." (*Ramirez*, *supra*, 13 Cal.5th at p. 1039.) We have previously held that Sacramento County's large size and metropolitan character "weighed heavily against a change of venue." (*People v. Pride* (1992) 3 Cal.4th 195, 224 (*Pride*); see *People v. Leonard* (2007) 40 Cal.4th 1370, 1396 [same].) And we have upheld venue change denials in counties with far smaller populations. (See, e.g., *Johnsen*, *supra*, 10 Cal.5th at p. 1148 [Stanislaus County, population 405,000]; *McCurdy*, *supra*, 59 Cal.4th at p. 1078 [Kings County, population 116,312].) Here too, the community's large size and diverse composition weighed against the need for a venue change.

The final two factors examine the community status of the defendant and victims. Here, neither defendant nor his victims were especially prominent apart from their involvement in this case. Any uniquely upsetting or sympathetic characteristics that gave them prominence would have become apparent wherever defendant was tried. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1214 (*Prince*); *People v. Dennis* (1998) 17 Cal.4th 468, 523 (*Dennis*).) Defendant lived in a neighboring county and had traveled to Sacramento County to commit the murders. But press reports did not depict him as an outsider, nor were there racial or sexual overtones to the crimes. (See *Famalaro*, *supra*, 52 Cal.4th at p. 23; *Prince*, at p. 1214.) As a White male, defendant "was not an outsider 'in any ethnic, racial, or gender sense.' " (*Scully*, *supra*, 11 Cal.5th at p. 575; see *McCurdy*, *supra*, 59 Cal.4th at p. 1079.) Defendant asserts that Johnson was prominent with local journalists because of his work for various news outlets and coverage of Sacramento Kings games. He notes that a moment of silence was observed in Johnson's

honor before one local contest nearly four years before the trial. But there was no evidence potential jurors had heard of any victim or the moment of silence. (See *Famalaro*, at pp. 23–24.) In *Harris*, *supra*, 57 Cal.4th at page 829, the California State Assembly had adjourned in honor of the victim's memory, and it was reported that the victim had been buried in Arlington National Cemetery. We concluded that, even assuming these facts indicated the victim's prominence, there was no suggestion they influenced the jury pool. (*Ibid.*) Here, the prominence factors do not weigh in favor of changing venue.

Defendant has also failed to show he was in fact prejudiced by pretrial publicity or denied a fair trial. (See *Prince*, *supra*, 40 Cal.4th at p. 1214.) *None* of the 12 seated jurors was from Elk Grove. Half had heard nothing about the case from the press. The other six jurors had heard some reports in the media but recalled few details about the events or defendant. Two of the five alternate jurors were from Elk Grove. Though they and the other alternates had heard about the case, all reported only vague familiarity with the details. No alternate served on the empaneled jury, "so any knowledge of the case they might have had could not have prejudiced defendant." (*Johnson*, *supra*, 60 Cal.4th at p. 983.)

In a prejudice analysis, " ' "[t]he relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." ' " (*Rountree*, *supra*, 56 Cal.4th at p. 840.) Significantly, every empaneled and alternate juror affirmed that they had formed no such opinions and could reach a decision based solely on the evidence presented in court. "Although a preexisting opinion is not disqualifying if the juror can set the opinion aside and decide the case solely on the

evidence presented in court [citation], these jurors did not even present that issue." (*People v. Avila* (2014) 59 Cal.4th 496, 512.)

Defendant has shown neither error nor prejudice. This case does not involve extraordinary circumstances from which prejudice may be presumed. (See *Skilling, supra,* 561 U.S. at p. 381; *People v. Suff* (2014) 58 Cal.4th 1013, 1049–1050.)

### 2. *Consular Notification*

Defendant next contends he was denied a fair trial and reliable death verdict because he was not advised of his right to contact the Canadian consulate, as required by section 834c and the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820 (Vienna Convention). He failed to raise this argument below, and it is forfeited on appeal. (See *In re Martinez* (2009) 46 Cal.4th 945, 964; see also *Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331, 359–360 [holding the Vienna Convention does not displace state procedural default rules].) It also lacks merit.

"The Vienna Convention requires that law enforcement officers convey to arrested foreign nationals, 'without delay,' that they have the right to have their consulate notified of their arrest. (Vienna Convention, *supra,* art. 36, par. 1(b), at p. 101 (Article 36); see § 834c, subd. (b).) [¶] Should the arrestee request consular notification, the law enforcement officer must promptly inform the consulate of the arrest. (Article 36, at p. 101.) These requirements of the Vienna Convention were enacted as state statutory law in 2000, but the California Legislature did not specify a remedy for their violation." (*People v. Vargas* (2020) 9 Cal.5th 793, 832 (*Vargas*).) Section 834c requires that law enforcement officers inform any "known or suspected foreign national" of the right to consular notification

within two hours of arrest, booking, or detention.  (§ 834c, subd. (a).)

"We have assumed, without deciding, that Article 36 gives foreign nationals individual, enforceable rights.  (See *In re Martinez*[, *supra*,] 46 Cal.4th [at p.] 957, fn. 3 . . . .)  Even so, 'Article 36 does not guarantee defendants *any* assistance at all.  The provision secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention — not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention. . . .' (*Sanchez-Llamas v. Oregon*[, *supra*,] 548 U.S. [at p.] 349 . . . .)"  (*People v. Leon* (2020) 8 Cal.5th 831, 846 (*Leon*).)  "A defendant is entitled to relief under the Vienna Convention if the defendant can show that a violation occurred, and that the violation resulted in prejudice." (*Vargas, supra*, 9 Cal.5th at p. 832.)

Defendant asserts he had a right to consular notice because he was born in Canada.  Yet he points to no basis upon which law enforcement officers would have had any reason to "know[] or suspect[]" that he might be a foreign national. (§ 834c, subd. (a).)  No mention was made in this case of defendant's Canadian birth until his mother testified to this fact, years after his arrest, in the penalty phase of trial.[6] Because defendant did not claim foreign birth when he was taken into custody or, according to the trial record, at any time

---

[6]    According to his mother's testimony, defendant was the child of two United States citizens but was born and lived for five months in Canada.  Under federal law, defendant was therefore a United States citizen at birth (8 U.S.C. § 1401, subd. (c)), though the parties agree his birthplace makes him a dual Canadian citizen.

thereafter, officers would have had no reason to suspect that he might be a foreign national. Nevertheless, defendant argues the *trial court* had a duty to notify him of his right to consular notice after his mother testified. Imposing such an obligation would be a remarkable extension of the Vienna Convention terms, which address the obligations of *investigating officers* after a foreign national's arrest. (See Vienna Convention, *supra*, art. 36, par. 1(b), at p. 101 (Article 36); *Sanchez-Llamas v. Oregon*, *supra*, 548 U.S. at p. 349.)

Finally, even if defendant had been entitled to consular notice, he shows no prejudice. "If a defendant is unable to make 'some showing that the violation had an effect on the trial,' the United States Supreme Court has explained that even with a 'properly raised and proved' Vienna Convention claim, 'it is extremely doubtful that [a] violation should result in the overturning of a final judgment of conviction.' " (*Vargas*, *supra*, 9 Cal.5th at p. 832.) The defendant must show not only that the consulate would have provided some specific assistance, but also that he could not have obtained that assistance from other sources. (See *People v. Mendoza* (2007) 42 Cal.4th 686, 711.) Here, defendant asserts only that he might possibly have obtained some unspecified "mitigation evidence" from Canadian records concerning his paternal grandfather, who, he represents, was a native of British Colombia. Defendant argues his grandfather was "the family patriarch" and points to evidence that "the family fell apart" after his death.

The notion that the Canadian consulate might have helped defendant locate new and otherwise unavailable information about his grandfather is entirely hypothetical, and the facilitation of potential discovery is well-attenuated from any basis in Article 36. Defendant presented an extensive

mitigation defense with testimony from family members and friends. He identifies no additional evidence the consulate would have helped him locate or present, how he was prevented from pursuing that information as part of his own trial preparation, or "how such evidence would have affected the outcome of his trial." (*Vargas, supra,* 9 Cal.5th at p. 834.) Accordingly, even assuming a consular notice violation, he is unable to demonstrate prejudice.

### 3. *Physical Restraints*

Defendant moved in limine to preclude the use of physical restraints during trial. Though defendant had been shackled during pretrial proceedings, counsel argued he should not remain so during trial because he had conducted himself appropriately in court.

Sacramento Deputy Sheriff Catherine Molica informed the court that defendant would "pose[] a very real and serious threat" to deputies, court personnel, and the public if measures were not taken to restrain him at trial. She stated that, during the entire time defendant had been in custody, he "ha[d] displayed disruptive and non-conforming behavior," including two physical altercations with other inmates. In the first incident, defendant was in a fight involving eight inmates. About five months later, defendant was in another fight with several inmates in which improvised shanks were used. He was placed on full restriction for 15 days for this offense. During his time in custody, defendant had received five "major" disciplinary writeups, along with one minor and three informal reprimands. His "other behavioral problems" included refusing to comply with jail personnel, spitting and throwing objects at staff, and not swallowing his medication. Approximately eight months

before the hearing, defendant had been removed from the general population and "reclassified as a total separation inmate due to his part in . . . instigating racial conflicts and threatening other inmates." To ensure safe, nondisruptive proceedings, the sheriff's staff requested that defendant be seated in a security chair with his legs restrained. Similar methods had been used during pretrial proceedings. When a deputy once started to remove the leg shackles, defendant said he could leave them on "because he was, . . . 'not planning on playing soccer,' " which suggested to the deputies that he was not "burdened or embarrassed" by the restraints. Deputy Molica suggested that the leg chains be wrapped to ensure they would not make noise during the trial.

Counsel objected that the defense had not received discovery of the jailhouse incidents. She argued defendant was a victim in the second fight, and so that incident should not affect the court's decision. Though Molica related that defendant had received copies of each writeup and the prosecutor observed that police reports of the first inmate fight had been provided to the defense, the court continued the matter to allow the defense to pursue further discovery.

At the next hearing, counsel confirmed that the defense had received copies of all incident reports and offered to provide them to the court. The court noted it had reviewed Deputy Molica's statement from the prior hearing and did not find it necessary to review the reports as well. Defense counsel argued shackling was unnecessary because defendant was not the instigator of the inmate fights and was in fact seriously injured in the second one. Moreover, defendant had been respectful and cooperative in all pretrial proceedings. The court noted that defendant had been restrained during all prior proceedings and

found it appropriate to consider his conduct outside the courtroom. It found a manifest need justified the restraints. It concluded that the security chair and wrapped leg chains were "as unobtrusive as possible and effective as necessary under the circumstances." The court offered to instruct the jury not to consider the fact that defendant was restrained, but the defense declined.

Defendant now contends the court abused its discretion and violated his constitutional rights by ordering him restrained during trial. The record supports the court's ruling, and in any event defendant fails to show prejudice.

Trial courts have broad power to maintain the security of their courtrooms, but their "discretion to impose physical restraints is constrained by constitutional principles." (*People v. Lomax* (2010) 49 Cal.4th 530, 558–559.) California law holds that "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290–291.) The federal Constitution similarly requires that the use of visible restraints be " 'justified by an essential state interest' — such as the interest in courtroom security — specific to the defendant on trial." (*Deck v. Missouri* (2005) 544 U.S. 622, 624.)

In determining manifest need, " 'courts consider several factors, including evidence that the defendant poses a safety or flight risk or is likely to disrupt the proceedings.' [Citation.] Although no formal hearing on the matter is required [citation], 'when the use of restraints is based on conduct of the defendant that occurred outside the presence of the trial court, sufficient evidence of such conduct must be presented on the record so that

the court may make its own determination of the nature and seriousness of the conduct and whether there is a manifest need for such restraints. [Citation.] The court may not, we have emphasized, merely rely on the judgment of law enforcement or court security officers or the unsubstantiated comments of others.' " (*People v. Poore* (2022) 13 Cal.5th 266, 285 (*Poore*).) The decision to impose restraints is reviewed for abuse of discretion. (*People v. Bell* (2019) 7 Cal.5th 70, 123 (*Bell*).) "To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

Defendant argues there was no manifest need for the restraints because he had not possessed weapons, expressed an intent to escape, or acted out while actually in the courtroom. Sufficient evidence supports the court's finding. Defendant had engaged in two inmate fights, one involving weapons, and resisted jail staff in various ways, including spitting and throwing things at them. He had received numerous disciplinary writeups and eventually had to be separated from the general population due to his threating and racially provocative behavior with other inmates. Assaults against inmates and other nonconforming behavior while in custody can justify the use of restraints. (See, e.g., *People v. Miracle* (2018) 6 Cal.5th 318, 347; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1032 (*Lewis and Oliver*); *People v. Hawkins* (1995) 10 Cal.4th 920, 943–944.) Although defendant argued he did not instigate the two inmate fights, the trial court could regard his participation in them as troubling nonetheless, especially in combination with the other disciplinary violations. "The fact that these incidents occurred outside of the courtroom does not

diminish their relevance or their support for the trial court's order." (*Miracle*, at p. 347.) Notwithstanding his courtroom behavior in pretrial proceedings, "the decision to impose restraints need not be based solely on a defendant's courtroom conduct [at trial]." (*Poore*, *supra*, 13 Cal.5th at p. 288.)

Next, defendant contends the court improperly declined to review the jail incident reports. "It is true that a trial court abuses its discretion if it delegates this decision to law enforcement officers. [Citations.] However, '[t]he court here was clearly aware of its obligation to make its own determination on the need for restraints, and not simply defer to the wishes of the prosecutor or courtroom security personnel.'" (*Bell*, *supra*, 7 Cal.5th at pp. 123–124.) Although a formal evidentiary hearing was not required (*Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1032), the court heard a lengthy statement from Deputy Molica describing the same conduct that was reflected in the incident reports. Defendant does not cite any specific information from the reports that was not covered in Molica's statement. The court continued the hearing so that defense counsel could review the reports and present a fully informed opposition. Thereafter, it heard argument from defense counsel and a further statement from Deputy Molica. There is no suggestion that the court's decision reflected anything other than its own evaluation of risk based on information of defendant's violent and disruptive conduct in custody.

Further, defendant again shows no prejudice. This court has "consistently held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense." (*People*

*v. Anderson* (2001) 25 Cal.4th 543, 596; see *People v. Williams* (2015) 61 Cal.4th 1244, 1259.) While defendant asserts that jurors "*may have* seen or heard the shackles," the phrasing of this claim "reveals [its] speculative nature." (*Poore, supra,* 13 Cal.5th at p. 291.) Defendant points to no evidence that the jury was aware of any restraints. Nor does the record support defendant's cursorily asserted claims that the restraints affected his mental state and hindered his communication with counsel. (See *ibid.*; see also *Williams,* at p. 1259; *People v. Jackson* (2014) 58 Cal.4th 724, 744.) "Especially when, as here, there is no suggestion the jury saw the restraints, we will not presume prejudice without evidence the restraints hampered the defendant's ability to participate in the trial." (*Poore,* at p. 290, fn. omitted.) There is none here.

### 4. *Jury Selection*

#### a. *Denial of Cause Challenges*

Defendant contends the court denied him due process, equal protection, and the right to a fair and impartial jury when it denied his for-cause challenges to 12 prospective jurors and declined to give him additional peremptory challenges.

The law regarding cause challenges is well settled. " ' "The state and federal constitutional guarantees of a trial by an impartial jury include the right in a capital case to a jury whose members will not automatically impose the death penalty for all murders, but will instead consider and weigh the mitigating evidence in determining the appropriate sentence." [Citations.] However, a "juror may be challenged for cause based upon his or her views concerning capital punishment only if those views would 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the

juror's oath." ' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 889.) The trial court's ruling on a challenge for cause will be upheld on appeal if " ' "fairly supported by the record." ' " (*People v. Rhoades* (2019) 8 Cal.5th 393, 440; accord, *People v. Westerfield* (2019) 6 Cal.5th 632, 666 (*Westerfield*).) Because that court is in the best position to observe demeanor and other nonverbal cues, when a prospective juror's responses are equivocal or conflicting, the trial court's determination of the juror's state of mind is binding on review. (*Westerfield*, at pp. 666–667; *Hamilton*, at pp. 889–890; see *Uttecht v. Brown* (2007) 551 U.S. 1, 9.)

Here, prospective jurors completed detailed questionnaires and individual panelists were questioned outside the presence of others when necessary to probe sensitive topics or evaluate specific exposure to pretrial publicity. Live questioning proceeded with the full panel divided into smaller groups. Eighteen members were initially called forward and questioned. The court then heard challenges for cause, followed by peremptory challenges. After seven panelists had been excused from the group of 18, seven new panelists were called forward, and the process was repeated until the full jury had been chosen.

By the end of this procedure, the defense had lodged 19 challenges for cause, 12 of which were denied. The defense used peremptory strikes to excuse nine of the panelists it had unsuccessfully challenged, and the prosecution struck two more. As a result, of the 12 panelists the defense had unsuccessfully challenged for cause, only one, Juror No. 8, sat on defendant's jury.

The Attorney General first maintains that defendant forfeited his claim of error because he did not use a peremptory challenge to remove Juror No. 8. " ' "As a general rule, a party may not complain on appeal of an allegedly erroneous denial of a challenge for cause because the party need not tolerate having the prospective juror serve on the jury; a litigant retains the power to remove the juror by exercising a peremptory challenge. Thus, to preserve this claim for appeal we require, first, that a litigant actually exercise a peremptory challenge and remove the prospective juror in question. Next, the litigant must exhaust all of the peremptory challenges allotted by statute and hold none in reserve. Finally, counsel . . . must express to the trial court dissatisfaction with the jury as presently constituted." ' " (*Westerfield, supra,* 6 Cal.5th at p. 665; see *Bell, supra,* 7 Cal.5th at p. 94; *People v. Souza* (2012) 54 Cal.4th 90, 130 (*Souza*).) Here, the defense used all of its 20 peremptory challenges and did object "to the jury as composed." But, before that time, during two rounds of peremptory challenges with Juror No. 8 in the jury box, the defense did not use a challenge to excuse him.[7]

---

[7] Defendant asserts that he did not have enough peremptory challenges remaining to excuse all of the cause-challenged jurors, and he was forced into a choice that ultimately left Juror No. 8 on the jury. The record is more nuanced. When Juror No. 8 was seated, the defense had four peremptory challenges remaining and there were six cause-challenged panelists in the jury box. Defendant used two peremptory challenges to excuse panelists he had challenged for cause, and then the prosecution struck a third panelist who had been unsuccessfully challenged by the defense. At that point, the defense had two peremptory strikes remaining with three cause-challenged panelists still seated. Instead of using both of its peremptory strikes on cause-challenged panelists, the

Even though defendant could have used a peremptory challenge to excuse the juror, it is true that he did not have enough challenges remaining to excuse all of the panelists he had unsuccessfully challenged for cause. Under these circumstances, we assume the claim is cognizable. Nevertheless, even if " 'the claim is . . . properly before us, we may reject it without examining the merits of [each of] defendant's challenges for cause because defendant cannot show prejudice.' " (*People v. Rices* (2017) 4 Cal.5th 49, 76 (*Rices*).) Prejudice, in this context, is determined by examining the ultimate composition of the jury that sat on defendant's case.

Of the 12 panelists defendant unsuccessfully challenged for cause, only one sat on his jury. Although defendant may have elected to use many of his peremptory challenges to excuse these panelists, the mere loss of peremptory challenges does not establish reversible error. (*People v. Black* (2014) 58 Cal.4th 912, 917 (*Black*).) "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." (*Ross v. Oklahoma* (1988) 487 U.S. 81, 88.) Accordingly, it is settled that "[a]n erroneous ruling that forces a defendant to use a peremptory challenge, and thus leaves him unable to exclude a juror who actually sits on his case, provides grounds for reversal only if the defendant '*can actually show that his right to an impartial jury was affected . . . .*' [Citation.] In other words, the loss of a peremptory challenge in this

---

defense used one to excuse a panelist defendant had *not* challenged for cause. It then passed the jury twice before exercising its final peremptory challenge to excuse a cause-challenged panelist.

manner ' "provides grounds for reversal only if the defendant exhausts all peremptory challenges *and an incompetent juror is forced upon him*." ' " (*People v. Yeoman* (2003) 31 Cal.4th 93, 114 (*Yeoman*); see *Souza, supra*, 54 Cal.4th at p. 131; see also *Black*, at p. 920 [reaffirming the *Yeoman* rule].) Because Juror No. 8 was the only challenged panelist who sat on defendant's jury, defendant can establish prejudice from the denial of his cause challenges only by showing that this juror should have been removed.

Defendant first argues Juror No. 8 was biased because of "his foreknowledge of the case, which left him psychologically traumatized." The record is otherwise. The juror saw television reports when the shootings occurred. He did not follow the story but said he was surprised "something like that would take place," especially in Sacramento or Elk Grove. He affirmed in voir dire that he had formed no opinions about the case based on this pretrial publicity, and he said that if seated he would base his decision solely on the evidence received at trial. When defense counsel pressed for his feelings about the incident, Juror No. 8 said he felt "[j]ust maybe a little sympathy for the victims." He explained that he ate out often and, "because of being picked on this particular case," he now found himself checking his surroundings when he left restaurants. Contrary to defendant's assertion of psychological trauma, the juror said he thought about the crimes for only a week or two after they happened and didn't remember them until being called for jury duty. He said he "hadn't even thought about it until [he] got selected for this particular case." He did not think his feelings would affect his service as a juror.

The defense challenged Juror No. 8 for cause, arguing he had been emotionally affected by what he had heard about the

case. The prosecutor responded that "this case has probably made all of us a little bit leery in going out," but that feeling did not mean the juror was substantially impaired or unfit to serve. The court agreed and denied the challenge. Substantial evidence supports this ruling. The record indicates that Juror No. 8's passing familiarity with the facts did not bias him against defendant or affect his ability to be impartial. When asked for his thoughts about the case, Juror No. 8 expressed some sympathy for the victims. It was also reasonable for him to concede that the facts of the case, involving the random shooting of unsuspecting individuals as they left restaurants, caused him to feel some wariness when in similar surroundings. But the juror indicated these feelings were mild and did not "keep [him] from enjoying [a] night out." He reported that he did not believe they would affect his ability to serve.

The law does not require jurors who have heard nothing about a case. Nor does it demand jurors bereft of all feeling. Instead, both sides are entitled to 12 jurors prepared and able to decide the case solely on the evidence presented and to return a verdict based not on emotion, but on a fair and even-handed evaluation of that evidence, following the guidance provided by the court. As noted, our review of this issue is deferential, recognizing " 'that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' " (*People v. Turner* (2020) 10 Cal.5th 786, 811.) The trial court was best situated to evaluate Juror No. 8's responses; we have no basis to disturb its ruling.

Separately, defendant argues the court should have removed Juror No. 8 because he had a "fixed opinion that the death penalty should be imposed automatically for certain offenses, including the random killings of multiple people." Defendant did not challenge Juror No. 8 on this ground below but now contends the court should have removed the juror sua sponte.[8] We have repeatedly explained that "a trial court has no sua sponte duty to excuse jurors for their views on the death penalty." (*People v. Clark* (2016) 63 Cal.4th 522, 565; see *People v. Taylor* (2009) 47 Cal.4th 850, 884.) Further, the record does not support defendant's claim that the juror held a fixed opinion.

Juror No. 8 wrote in the questionnaire that "[s]ometimes" an intentional killer should receive the death penalty, "[i]f the victim was totally unknown to the assailant and [the murder was] just for the joy of killing." In-person questioning probed these views more deeply. Juror No. 8 explained he sometimes thought death was "the easy way out," but he did not believe those views would influence his vote as a juror. In response to defense counsel's questioning, he said he believed the death penalty "is a necessary tool of the judicial system" to handle people who cannot be rehabilitated. He gave the example of "a habitual killer" or "serial killer" and agreed with counsel that such people should "automatically" receive the death penalty. However, his views were not settled, and he explained he had never really thought about the death penalty before this case. It

---

[8] Defense counsel challenged Juror No. 8 after he was questioned separately about his exposure to pretrial publicity. The juror was later questioned in open court about his views on the death penalty, mitigation evidence, and other topics. After this voir dire, defense counsel raised cause challenges to three other panelists in the same group but *not* Juror No. 8.

was participation in the selection process that brought the question of capital punishment "to the forefront of [his] mind." In further questioning from defense counsel, he said he did not favor one penalty over another "in this particular case" and affirmed that life imprisonment without parole could be an appropriate punishment for someone who had committed two intentional murders. But he said he did not believe the death penalty should be imposed automatically in such cases, and he would want to consider the specific circumstances involved. He agreed with defense counsel's assessment that he did not favor one penalty over the other and said that, to him, life imprisonment without the opportunity for release seemed a harsher punishment. When questioned by the prosecutor, Juror No. 8 said he was open to the idea that some people adapt and do well in prison. He agreed that he could vote for either death or life imprisonment without parole, and he had no feeling either way as to how he might vote at the penalty phase. When pressed by the prosecutor to say which penalty he would favor if it was proven that defendant deserved the worst penalty, Juror No. 8 explained he would need to hear all the evidence. He did affirm that, personally, he felt life imprisonment without parole was the worst possible punishment, but he could vote for death if that penalty was warranted by the evidence.

This record amply demonstrates that Juror No. 8 was competent to serve and did not harbor an impermissible bias. He repeatedly said he could consider both penalties, depending on the evidence, he was open to imposing life imprisonment without parole in the particular circumstances presented here, and he personally considered life in prison the harsher punishment. Defendant has not demonstrated "that an incompetent juror was forced on him" as a result of the court's

rulings. (*Rices*, *supra*, 4 Cal.5th at p. 76.) Accordingly, we need not examine defendant's other cause challenges to conclude his right to a fair and impartial jury was preserved. (See *ibid.*; see also *Black*, *supra*, 58 Cal.4th at pp. 918–919; *Yeoman*, *supra*, 31 Cal.4th at p. 114.)

### b. *Defense Counsel's Remark*

Defendant asserts one of his attorneys provided constitutionally deficient assistance by asking a question in jury selection that assumed he would be found guilty of premeditated, special circumstance murder. In his reply brief, he further contends the error was structural because counsel's admission of guilt denied him the ability to control the objective of his defense. (See *McCoy v. Louisiana* (2018) 584 U.S. 414 (*McCoy*).) The premise of both arguments fails because, considered in context, counsel's remark could not reasonably be understood as an admission of his client's guilt.

During voir dire, defense counsel sought to probe statements by Prospective Juror Joe M. that either the death penalty or life imprisonment without parole could be justified depending on the evidence. Counsel and the panelist had the following exchange:

"Q. Now, let me go to that next step. And the only time that you would get to a point where you would have to make a decision that we're talking about, life in prison without possibility of parole or the death penalty, is if you and 11 other jurors came to the conclusion beyond a reasonable doubt that the defendant was guilty of a first degree premeditated, deliberated, and malicious murder. And also that there was a special circumstance which in this case is multiple murder,

another murder. Then and only then would you be called upon to make that decision.

"Now, I'm gonna ask you two questions. The first one is, is that the type of crime which you feel should be eligible for the death penalty?

"A. Yes, sir.

"Q. The second question is, do you feel that that is the type of crime which should be eligible also for life without possibility of parole? I'm talking about your own personal feelings. I'm — not what the law says.

"A. Right. I guess I agree with that as well.

"Q. Okay. Now, next question is, what would be important to you to hear in making that decision?

"A. I would want to make sure — I would want to know the entire facts of the case, of the situation, and so we could make a good decision.

"Q. Well, presumably, *if the prosecutor does his job which I know he will*, you're gonna hear the facts of the case, if you will, what happened. It's already gonna be completely vetted in the first part of the trial. And *you're going to have found beyond a reasonable doubt that that's what happened*.

"Now, in the second phase, as we have been talking about, there's other things you're gonna hear. Are you gonna be open to hearing about the defendant's mental state —

"A. Yes, I will be.

"Q. — at the time of the commission of the offense?

"A. I can be."

Defendant objects to the italicized language, summarizing it as an admission that, "if the prosecutor does his job[,] which I know he will," the jurors would find defendant guilty of premeditated murder with a multiple murder special circumstance. Considered in the full context of counsel's questioning, however, no reasonable juror who heard this exchange would have understood defense counsel to be admitting his client's guilt. It is clear he was explaining to Joe M. that *if he got to a penalty phase*, he and the other jurors would have already heard "the entire facts of the case" and would have unanimously found defendant guilty of the charged crimes beyond a reasonable doubt. Counsel was not admitting defendant's guilt but emphasizing that, before any consideration of penalty, the jury would have already heard all the facts and decided the state had proven his guilt.

"To demonstrate ineffective assistance of counsel," a defendant " 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' [Citation.] On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)" (*Johnsen, supra*, 10 Cal.5th at p. 1165; see *Strickland v. Washington* (1984) 466 U.S. 668, 687–688.)

Read in context, counsel made no admission of his client's guilt. Far from performing deficiently, counsel was trying to ascertain the essential question of Joe M.'s openness to mitigating evidence *if* a guilty verdict were returned and the trial proceeded to the repeatedly explained penalty phase. He did so by probing how the prospective juror would approach a penalty determination if called upon to do so.

Finally, it should be recalled that Joe M. did not sit on defendant's jury because the defense used a peremptory challenge to excuse him. Two panelists who eventually became jurors were in the courtroom during the questioning of Joe M. but, even assuming they heard the exchange, all prospective jurors were instructed that questions they would be asked about the penalty phase were hypothetical and not meant as an assumption that there would be a penalty phase. Members of the jury were repeatedly instructed that questions or argument by the attorneys were not evidence and were not to be considered in reaching any verdict.

Rather than attempting to show prejudice, defendant argues prejudice should be presumed because his attorney "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." (*United States v. Cronic* (1984) 466 U.S. 648, 659.) However, the Supreme Court later clarified that, for the *Cronic* rule to apply, "the attorney's failure must be complete." (*Bell v. Cone* (2002) 535 U.S. 685, 697.) Thus, prejudice is presumed under *Cronic* " 'only where counsel was either totally absent or was prevented from assisting the defendant at a critical stage.' " (*People v. Brown* (2014) 59 Cal.4th 86, 115.) Neither happened here. Nor could counsel's question in voir dire be reasonably understood as a concession of guilt made against defendant's wishes, as occurred in *McCoy*,

*supra*, 584 U.S. at pages 417 to 418. Defendant's two attorneys presented an assertive defense at both the guilt and penalty phases. There is no indication they infringed upon defendant's constitutional right to decide the objective of his defense. (See *id.* at pp. 417–478, 422.)

## B. *Guilt Phase Issues*

### 1. *Witness Issues*

Defendant asserts two claims related to the presence of witnesses. He contends the court abused its discretion by allowing two witnesses to remain in the courtroom after their guilt phase testimony. He also argues that one witness's courtroom conduct intimidated jurors and was exacerbated by the misconduct of a prosecution witness who spoke to jurors about the issue. The court did not abuse its discretion by allowing the witnesses to remain in court after their testimony, and any spectator or juror misconduct was not prejudicial.

#### a. *Presence in Courtroom*

The court granted joint motions in limine for prospective witnesses to be excluded from the courtroom. However, shortly before trial, the prosecution noted that Mike Daly's sister Maureen and Jon Johnson's wife Karen both wanted to attend. Concerned that they might have an emotional reaction to some photographs, defense counsel objected to their attendance after opening statements. The prosecutor agreed to have the witnesses leave the courtroom once testimony began. Trial then proceeded through pre-instructions, opening statements, and the prosecution's first four witnesses. Neither woman was present for that testimony.

The next day, Maureen Daly was the prosecution's first scheduled witness. Before she took the stand, the prosecutor

reported that she had asked to remain in the courtroom after her testimony to watch the rest of the trial. He did not expect her to testify again in the guilt phase but did not rule out calling her as a witness in the penalty phase. Defense counsel was concerned that the trial evidence could provoke an emotional reaction or affect Maureen's penalty phase testimony. The court observed that any penalty phase testimony would be limited to "the impact of the loss, not anything that occurred during the trial." It did not see a problem with her attendance so long as the prosecutor did not call her to testify again in the guilt phase. Defense counsel then objected that jurors would be able to watch Maureen during trial and might develop a connection with her that would prejudice defendant in the penalty phase. In light of this objection, the court ruled that Maureen could attend the trial only if she did not testify in the penalty phase. When the prosecutor noted that Karen Johnson also wanted to stay in the courtroom after her testimony, the court denied the request because Karen was expected to be a witness again in the penalty phase.

On the morning of the trial's third day, the prosecutor asked the court to reconsider its ruling. He directed the court's attention to other cases in which family members were allowed to remain in court and argued there was no statutory basis for excluding the witnesses after they had testified. He also stressed that penalty phase testimony from the witnesses would concern different subjects and would not relate to their experience of watching the guilt phase trial. The court ultimately agreed to allow both witnesses to remain in attendance so long as they were excused after their testimony and not subject to recall in the guilt phase.

Under section 1102.6, "[i]mmediate family members of a murder victim have the right to attend trial subject to 'overriding interests,' such as the defendant's right to a fair trial." (*People v. Winbush* (2017) 2 Cal.5th 402, 463 (*Winbush*); see § 1102.6, subds. (b)(1), (c).) Although this statutory right of attendance does not prevent the court from excluding a victim or family member who has been subpoenaed as a witness (see Evid. Code, § 777, subd. (a)), any such exclusion must be narrowly tailored "to allow the victim to be present, whenever possible, at all proceedings" (Pen. Code, § 1102.6, subd. (d)). A ruling on a motion to exclude witnesses, or to permit the presence of a victim witness, is reviewed for abuse of discretion. (*People v. Tully* (2012) 54 Cal.4th 952, 1004 (*Tully*); *People v. Griffin* (2004) 33 Cal.4th 536, 574 (*Griffin*).) The court's ruling was within its discretion.

Defendant does not dispute that Maureen Daly and Karen Johnson were "immediate family" members of the murder victims. (§ 1102.6, subd. (c).) To justify their exclusion, defendant had to show "a substantial probability" that his "right to a fair trial" would be prejudiced by their presence. (*Id.*, subd. (b)(1)(A).) He failed to do so. The risk of possible prejudice alone is not sufficient to establish an abuse of discretion. (*Griffin, supra*, 33 Cal.4th at p. 574.) Defendant argued the family members' attendance in the guilt phase trial could influence their victim impact testimony or otherwise affect the fairness of the penalty phase, but we have rejected such arguments as speculative. (See, e.g., *Tully, supra*, 54 Cal.4th at pp. 1005–1006; *People v. Myles* (2012) 53 Cal.4th 1181, 1213, 1215 (*Myles*).) There is no general bar against family members attending the guilt phase then testifying as victim impact witnesses in the penalty phase. (See *Winbush, supra*, 2 Cal.5th

at p. 464.) Defendant now argues prejudice was shown by Maureen's later conduct in the courtroom. He concedes, however, that the trial court's determination of potential prejudice is reviewed based on "the record of the proceedings before it at the time the ruling was made." (*Griffin*, at p. 574.) No abuse of discretion appears.

### b. *Alleged Misconduct*

Next, defendant contends jurors were "intimidated" by two related incidents of misconduct. The court conducted a thorough investigation and determined defendant's right to a fair trial had not been prejudiced. Substantial evidence supports this ruling.

Near the end of the guilt phase trial, the court learned that Maureen Daly had been sketching various participants in the trial, including courtroom personnel and the defendant. A juror told the bailiff she thought Maureen had been sketching her and that she felt "a little creeped out" about it. The juror had also had an encounter with a prosecution witness, Detective Elaine Stoops. Each of the named individuals was brought into court separately, apart from the jury and spectators, and questioned by the court and counsel for both sides.

Detective Stoops explained that while she was in the hallway waiting to testify, she overheard a juror saying she did not like Maureen "drawing pictures of them." Another woman, whom Stoops thought was a witness, approached and said she did not like it either and worried that Maureen might stop her in the street or stalk her. Believing the encounter to be an improper exchange between a juror and a witness, Stoops intervened and attempted to "defuse" the situation. Addressing herself to the person she thought was a witness, but who was in

fact Juror No. 12, Stoops said Maureen was an artist and "she's been here six weeks." The juror responded, "So have I." Stoops countered, "Well, you know, some things are just out of our control," and Juror No. 12 replied, "Yeah, that's why I'm here." Upon discussing this exchange with Daly's family members, Stoops realized the woman she had been addressing was a juror and reported the incident to the prosecutor.

Asked about her sketches, Maureen told the court she was a landscape artist and not experienced drawing people. The few sketches she had made of the jury were "basically contour drawings where you're looking, but you're not looking down at your paper." While she had perfected drawings of the bailiffs, court reporter, prosecutor, and judge, most people in her other sketches were unrecognizable. She made a contour drawing of the first row of the jury because they were in her peripheral vision, but it was "more of an outline, a composition of the jury as a group," and it would be impossible to recognize any individual jurors. After examining her, the court instructed Maureen not to make any more sketches during trial.

The court next questioned Juror No. 12. The juror explained that she and Juror No. 7 had been discussing Maureen's sketching when Detective Stoops entered the conversation. Juror No. 12 said it was apparent from Maureen's behavior that she was drawing people, which she found "weird" and disconcerting, as if jurors' anonymity and privacy were being invaded. In response to questioning, Juror No. 12 then gave roughly the same account of her conversation with Detective Stoops as Stoops had reported. She noted that an alternate juror had first brought the sketching to her attention. The court assured Juror No. 12 that the sketching had been put to a stop. The court had been told sketches of the jury were

merely "broad outlines, nothing detailed," and he would look at the drawings themselves to confirm this fact. He then asked if there was anything about the sketching that would cause Juror No. 12 difficulty in deciding the case. She replied, "No, not at all." Because the sketches had been made by a witness, the court asked whether the juror would have "any issues . . . properly evaluating her testimony and the rest of the evidence in the case." Juror No. 12 responded, "not at all. I can separate the two issues." She assured the court that her perception of being sketched would have no impact on her ability to continue on the jury. In response to questions from the prosecutor, she confirmed that she and the alternate juror had discussed Maureen's sketching only once. Although she had seen the sketching occurring in court, she was still "absolutely" able to focus on the testimony. She agreed with the prosecutor's assessment that Stoops' tone with her had been "a little snippy," but she could still keep an open mind and would not discount Stoops' testimony because she was annoyed with her.

The court next questioned Juror No. 7. Though she was uncomfortable about someone sketching her, she felt better when the court assured her that the sketching had been stopped and sketches of the jury were not detailed. She assured the court nothing about the incident would affect her ability to remain fair and unbiased. She would evaluate the testimony of the sketch artist the same as that of any other witness, giving it no more or less weight as a result of the incident.

The alternate juror mentioned by Juror No. 12 was also examined. The alternate reported that while she and other jurors were having a conversation about a witness sketching them, Detective Stoops approached and explained that Maureen was an artist and had been in court for the past six weeks. The

alternate told the court it felt odd to be stared at, but otherwise the sketching did not bother her. Nothing about the sketching or Detective Stoops' conversation with the jurors would affect her ability to decide the case or evaluate the witnesses' testimony. The alternate never served on the jury.

The court admonished Detective Stoops not to speak with people in the hallway and informed the entire jury, with no spectators present, about Maureen's background as an artist and the types of contour drawing she had done. It advised jurors that they had privacy rights, the sketching would stop, and no likeness of a juror had been rendered. It invited the jurors to voice concerns, but all expressed satisfaction with the court's assurances. There was no defense motion to hold Stoops in contempt, strike her testimony, or otherwise admonish the jury.

Defendant's attorneys had an opportunity to question each participant. They did not complain that the court's investigation was inadequate, nor did they move for a mistrial. Defendant now contends jurors were so intimidated by the sketching and the improper contact from Detective Stoops that he was denied a fair trial and reliable penalty verdict.[9] "Because defendant never moved for a mistrial on the ground of spectator

---

[9] As the Attorney General notes, the jurors also appear to have committed misconduct by talking to Detective Stoops. Jurors are not permitted to "converse among themselves, or with anyone else. . . . on any subject connected with the trial." (§ 1122, subd. (a)(1).) Furthermore, "[a] juror's unauthorized contact with a witness is improper." (*People v. Cowan* (2010) 50 Cal.4th 401, 507.) Here, defendant expressly disavows any juror misconduct claim, asserting "[i]t was not the jurors who committed misconduct, but the prosecution witnesses." Because defendant has chosen to focus his claim on spectator misconduct only, we do the same.

misconduct, he has forfeited this claim." (*People v. Carrasco* (2014) 59 Cal.4th 924, 965; see *People v. Chatman* (2006) 38 Cal.4th 344, 368 (*Chatman*).) The argument also fails on the merits.

"A spectator's conduct is grounds for reversal if it is 'of such a character as to prejudice the defendant or influence the verdict.' " (*Myles*, *supra*, 53 Cal.4th at p. 1215.) In *Holbrook v. Flynn* (1986) 475 U.S. 560, 572, the high court has likewise explained that spectator conduct violates the federal Constitution if it is "so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." "The trial court has broad discretion to ascertain whether a spectator's actions were prejudicial." (*Myles*, at p. 1215; see *Chatman*, *supra*, 38 Cal.4th at p. 369.)

Here, immediately upon learning of the issue, the court conducted an investigation, questioning each juror who had discussed concerns about the sketching among themselves and with Detective Stoops. The sketching of courtroom personnel was not disruptive to the proceedings, and it is unclear whether this activity in itself constituted misconduct. Nevertheless, because jurors said they felt uneasy about being drawn, the court properly instructed Maureen to stop sketching anything in the courtroom. It also admonished Detective Stoops not to talk with anyone in the hallway. This witness's contact with jurors, even if unintentional, was unquestionably misconduct. However, there is no indication of prejudice. Each juror repeatedly assured the court that she could decide the case fairly and would not evaluate the testimony of Maureen, or Stoops, or any other witness differently as a result of the sketching or the hallway conversation. "Having observed the courtroom proceedings firsthand," along with the demeanor of the jurors it

examined, "the trial judge was in the best position to evaluate the impact of" the asserted misconduct. (*Myles*, *supra*, 53 Cal.4th at pp. 1215–1216.) The court accepted the jurors' assessment that they could remain fair and impartial. Nothing in the record undermines that conclusion. Apart from labeling the conduct "juror intimidation," defendant does not explain how the behavior deprived him of a fair trial. He argues jurors would have been motivated to give the court false assurances so they could avoid being removed as the case approached the end of the guilt phase, but these assertions derive from mere speculation and have no basis in the record.

### 2. *Defendant's Statements*

Defendant moved to suppress his statements in the hospital that he was " 'on methamphetamines,' " " 'knew what [he] was doing' " on the night of the shootings, and " 'just [did not] want to live.' " He argued the statements were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), were involuntary, and were more prejudicial than probative (see Evid. Code, § 352).

At a pretrial hearing, Elk Grove Police Officer Jeff McHenry testified that on March 27, 2006, he was assigned to guard defendant in the hospital. He sat next to defendant's bed watching a training video on his laptop while defendant drifted in and out of consciousness. They had not spoken to each other at all. When a nurse came in to change defendant's dressings, McHenry spoke to her, asking if defendant had been under the influence of narcotics or alcohol when he was admitted. She did not answer, but defendant said, " 'I was on methamphetamines.' " Immediately afterward, he added, " 'I knew what I was doing that night.' " McHenry asked nothing

further but, as the nurse tended to his injuries, defendant said, " 'I just don't want to live.' " At no time during the encounter did Officer McHenry speak to defendant. On cross-examination, McHenry explained that he asked the question of the nurse out of curiosity and denied an intention to "find out something incriminating." When defense counsel pressed the officer about whether it was his practice to ask questions that could elicit incriminating information, he responded, "If I was curious, I would." The court took judicial notice of medical records showing that defendant had recently undergone surgery and was receiving treatment at the time of his statements. Defendant was not interviewed by the police until the following day.

The court denied the suppression motion. It found that, though defendant was clearly in custody, Officer McHenry had asked him no question at all, "let alone [one] designed to elicit a[n] incriminating response." Instead, he had asked a question of the nurse, and defendant had "volunteered" information. The court found no *Miranda* violation and ruled the statements admissible. Defendant now contends this ruling violated his state and federal constitutional rights against self-incrimination and to a fair trial and reliable penalty verdict. The statements were properly admitted.[10]

---

**10** Defendant does not renew arguments from his moving papers at trial that the statements were involuntary and more prejudicial than probative, nor did he press for a ruling on these grounds below. Although he urges that the statements "were not knowing, voluntary or intelligent" and "were highly prejudicial," he fails to support these assertions with reasoned argument or authority. He has not attempted to show, as would be required to establish involuntariness, that his " ' " 'will [was] overborne and his capacity for self-determination critically

"The Fifth Amendment to the United States Constitution provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the 'inherently compelling pressures' of the custodial setting (*Miranda, supra*, 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise a suspect of his right to remain silent and to have counsel present prior to any custodial interrogation (*id.* at pp. 444–445)." (*People v. Miranda-Guerrero, supra*, 14 Cal.5th at pp. 15–16.) The *Miranda* advisements are required when a suspect is both in custody and subject to an interrogation. (See *Miranda*, at pp. 467–468; *People v. Mickey* (1991) 54 Cal.3d 612, 648 (*Mickey*).) The Attorney General concedes defendant was in custody; accordingly, we focus on the interrogation question. In reviewing a *Miranda* claim, "we accept the trial court's factual findings and credibility assessments if supported by substantial evidence." (*Leon, supra*, 8 Cal.5th at p. 843.) We independently review the court's legal ruling. (*People v. Johnson* (2022) 12 Cal.5th 544, 578).

In the *Miranda* context, "interrogation" is a term of art. It "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301

_____

impaired' " ' " by " 'coercive police conduct.' " (*People v. Caro* (2019) 7 Cal.5th 463, 492; see *People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 20.) Nor has he explained why the statements could be regarded as more unduly prejudicial than they were probative. Accordingly, our discussion focuses on the *Miranda* claim.

(*Innis*).) Whether police conduct was "reasonably likely to elicit an incriminating response" is judged primarily from the point of view of the suspect, "rather than the intent of the police." (*Ibid.*) Statements that are volunteered, and not made in response to an interrogation, "are not barred by the Fifth Amendment." (*Miranda, supra*, 384 U.S. at p. 478.) "*Miranda* does not 'prohibit the police from merely listening to . . . voluntary, volunteered statements' uttered by a person, whether or not in custody, 'and using them against him at the trial' — nor does the Fifth or Fourteenth Amendment. (*Edwards v. Arizona* (1981) 451 U.S. 477, 485.)" (*Mickey, supra*, 54 Cal.3d at p. 648.)

The record supports the trial court's conclusion that defendant's statements were volunteered. According to the undisputed evidence, Officer McHenry did not speak to defendant or otherwise interact with him at any time. He asked a single question of a nurse who entered the room. Given that defendant was recovering from surgery, had been drifting in and out of any level of consciousness, and had no interaction with the officer, there was no reason to think he would have been aware of or felt compelled to speak in response to a question not asked of him. Although defendant suggests his compromised physical and mental state made it more likely he would make an incriminating statement, the test is an objective one (*People v. Elizalde* (2015) 61 Cal.4th 523, 537; see *Michigan v. Bryant* (2011) 562 U.S. 344, 360, fn. 7), focusing on whether the police "*should have known* [their actions] were likely to elicit an incriminating response" (*Innis, supra*, 446 U.S. at p. 302). Under these circumstances, McHenry could not reasonably have known that speaking to the nurse would produce an incriminating statement from defendant.

Nevertheless, defendant argues the officer "had no legitimate reason to ask the question" about his drug use on the night of the shootings. He contends the question was "pretextual," an intentional ploy to elicit incriminating information from him, because, he urges without elaboration, the officer should have known that medical confidentiality laws prohibited the nurse from answering. (See Civ. Code, § 56.10, subd. (a).)[11] He also notes that McHenry gave no reason for his question other than "curiosity" and agreed with defense counsel that he might ask a potentially incriminating question when he "was curious" about something. However, "applications of the *Miranda* rule generally do not turn upon the individual officer's subjective state of mind, but rather upon the accused's perception of his or her circumstances." (*People v. Peevy* (1998) 17 Cal.4th 1184, 1199.)

On this issue, the facts of *Innis* provide context. There, after the suspect in a shooting had been taken into custody and placed in a patrol car, officers in the car began discussing, in the defendant's presence, the urgency of finding the missing weapon. (*Innis, supra,* 446 U.S. at p. 294.) One said that a school for " 'handicapped children' " was nearby. (*Ibid.*) They noted it would be terrible if children were to find the gun and hurt themselves with it. (*Id.* at pp. 294–295.) The suspect

---

[11] The Attorney General argues this claim of pretext has been forfeited because it was not raised below. However, though he did not focus on this argument in the hearing, defendant's moving papers did cite the Confidentiality of Medical Information Act (Civ. Code, § 56 et seq.) (Act) as a reason the officer should have known his question was "improper." Without parsing the particulars of the Act, we conclude this assertion was sufficient to preserve the claim.

interrupted this conversation, told the officers to turn the car around, then directed them to where the gun was located. (*Id.* at p. 295.) The United States Supreme Court acknowledged that the officers' conversation "struck a responsive chord" and may have subjected the suspect to " 'subtle compulsion,' " but it determined there had been no custodial interrogation. (*Id.* at p. 303.) The court did not consider the conversation to be "the 'functional equivalent' of questioning" (*id.* at p. 302), nor did it conclude the officers could have known that the suspect "would suddenly be moved to make a self-incriminating response" (*id.* at p. 303). Because there was no interrogation here, the fact that defendant interjected a remark, similar to statements he made to others in the days following, does not support exclusion of the evidence.

Defendant offers a number of arguments disputing whether the incriminating statements were even made. He contends drug users generally refer to methamphetamine by a slang term, not the full scientific name, and when homicide detectives questioned him the next day he said he did not remember shooting anyone. These arguments miss the point. While they may point to valid impeachment of Officer McHenry's testimony, and were conveyed through defense expert Douglas Tucker to that effect, they do not concern the *admissibility* of the statements.

### 3. *Impeachment of Defense Expert*

Defendant next raises two claims regarding the prosecutor's cross-examination of defense expert Douglas Tucker. In neither has he shown reversible error.

### a. Lack of Remorse

On direct examination in the guilt phase, Dr. Tucker opined that on the night of the shootings defendant suffered from a methamphetamine-induced psychosis and had delusions that the police were attacking him. He "lost touch with reality, or snapped," as a result. Dr. Tucker asserted defendant's fist pumps and shouts of " 'woo' " were not celebratory, but instead expressions of relief that he had survived his imagined attackers. The court reviewed the expert's notes and interview transcriptions in camera, then ordered that redacted copies be provided to the prosecution.

The following day, the court heard argument on the scope of the prosecutor's intended cross-examination. The defense objected to questioning on two items in Dr. Tucker's notes related to lack of remorse. The first was defendant's statement that he " 'fe[lt] bad for his victims . . . but so removed from them. I don't know them.' " The second concerned defendant's statement that when he "looked back, [he was] ashamed of being made a fool of like that." After this statement, Dr. Tucker noted: " 'Feels bad regarding what happened, [mainly] because [of] his daughter . . . . But he didn't know the people. It was almost like watching a movie, like it wasn't really him.' " The defense argued evidence of lack of remorse was inadmissible except at the penalty phase to rebut evidence of remorse. In response, the prosecutor argued Dr. Tucker's testimony had opened the door to questions about defendant's mental state. He maintained that the statements were relevant to impeach Tucker's diagnosis because they were consistent instead with the criteria for antisocial personality disorder. The court cautioned the prosecutor not to "get too far afield" in offering alternative diagnoses but agreed defendant's statements were relevant and

admissible to show his state of mind and awareness of his actions.

On cross-examination, the prosecutor first asked whether someone who had committed a drug-induced act of violence would be remorseful after "snapp[ing] out of it." Dr. Tucker disputed the premise, asserting that delusions can persist for weeks or months, and noted he had seen a broad range of reactions ranging from lack of insight to intense horror and grief. Later, he agreed that lack of remorse was among the diagnostic criteria for antisocial personality disorder. Because Tucker had described defendant's violent conduct as "apparently unmotivated," the prosecutor asked if a person who had committed such unmotivated violence would typically be remorseful when no longer in a psychotic state. Tucker agreed that "many people do experience significant remorse." He disagreed with the prosecutor's assertion that defendant had shown no remorse, noting that defendant felt ashamed and foolish about what had happened. The prosecutor then asked Dr. Tucker to comment on notes indicating defendant felt "removed" from the victims and had stated, "It hasn't affected me much, like people dying in Cleveland or something. I don't know them or their families, what they look like. It's not callousness. I just don't have any reference points for seeing them here and then gone." The notes reflected that defendant "feels bad for their children who will grow up without a father, but it doesn't directly impact his life." Dr. Tucker responded that the statements were taken out of context because defendant had previously described the events as " 'like a breakdown' " and said he believed people were trying to kill him. Finally, asked about his notes stating defendant "fe[lt] bad regarding what happened, [mainly] because of his daughter," Tucker agreed

that was what defendant had said. However, Tucker stood by his conclusion that the attacks were part of a methamphetamine-induced psychotic episode, not the result of antisocial personality disorder.

Defendant now contends the court abused its discretion by allowing the prosecutor to inquire about lack of remorse. He argues the evidence was irrelevant for any purpose and more prejudicial than probative. To the extent these objections were preserved, they lack merit. Taken together, the inquiry focused not so much on defendant's lack of remorse as on impeaching the expert who had discounted the statements or construed them differently in explaining his views to the jury.

Evidence of remorselessness is typically irrelevant at the penalty phase of trial because it does not relate to any statutory sentencing factor. (See *People v. Rivera* (2019) 7 Cal.5th 306, 343; *People v. Enraca* (2012) 53 Cal.4th 735, 766.) But this general principle does not mean remorse evidence is inadmissible for all purposes in either phase of trial. On the contrary, such evidence may be admitted in the guilt phase as rebuttal to defense evidence on the subject. (See, e.g., *People v. Jones* (1998) 17 Cal.4th 279, 307; *People v. Clark* (1993) 5 Cal.4th 950, 1016.) More broadly, evidence that tends to show a defendant's lack of remorse following a crime is admissible when relevant on a disputed issue. For example, in *Jackson*, *supra*, 58 Cal.4th at page 753, a murder suspect told arresting officers he would have shot them to avoid prison if he had been armed. On appeal from his penalty retrial, Jackson challenged the statement as improper evidence of his lack of remorse. (*Ibid*.) We concluded the statement's admission was not error because it was relevant to show Jackson's consciousness of guilt. (*Id*. at pp. 753–754.)

Here, defendant's statements, made to his own expert, that he felt removed from his victims and unaffected by their deaths were legitimate cross-examination to impeach the expert's opinion that the murders had resulted from a drug-induced psychotic episode. Topics an expert did not consider, or chose to minimize, are generally appropriate cross-examination material. (See *People v. Townsel* (2016) 63 Cal.4th 25, 55–56.) The trial court has wide latitude to control the scope of cross-examination (*People v. Steskal* (2021) 11 Cal.5th 332, 359 (*Steskal*)), including that of experts (*People v. Henriquez* (2017) 4 Cal.5th 1, 28 (*Henriquez*)). "An expert witness may be cross-examined about 'the matter upon which his or her opinion is based and the reasons for his or her opinion.' (Evid. Code, § 721, subd. (a).) The scope of this inquiry is broad and includes questions about whether the expert sufficiently considered matters inconsistent with the opinion. (*People v. Ledesma* (2006) 39 Cal.4th 641, 695.)" (*People v. Doolin* (2009) 45 Cal.4th 390, 434 (*Doolin*); see *People v. Nieves* (2021) 11 Cal.5th 404, 448.) The court did not abuse its discretion by allowing the prosecutor to impeach Dr. Tucker's opinion with evidence suggesting defendant's crimes were not the result of an impulsive, anomalous episode, but might instead have been the callous acts of someone conscious of his own conduct.

Nor has defendant established that the evidence was excludable under Evidence Code section 352. Beyond conclusory assertions that evidence of his lack of remorse was "more prejudicial than probative," defendant has failed to support the claim with reasoned argument. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793.) The claim is also forfeited because defendant did not raise this objection below. (See *Doolin, supra*, 45 Cal.4th at p. 434.) On the merits, the evidence

was relevant to impeach an expert's opinion on defendant's mental state at the time of the crimes, the primary disputed issue at the guilt phase. In contrast, the likelihood of unfair prejudice was minimal considering the array of other evidence, to which defendant did not object, that established his indifference toward his victims.

### b. Satanic Bible

In a hearing preceding Dr. Tucker's cross-examination, the prosecutor also said he planned to question the expert about defendant's possession of a paperback book called The Satanic Bible. A detective had previously testified that the book had been found in the trunk of defendant's car. Defense counsel objected that questions about this book and defendant's beliefs would be more prejudicial than probative and an improper attempt to elicit character evidence. The prosecutor countered that the evidence was admissible to show defendant's motivation. The court found evidence about the Satanic Bible permissible for this purpose but noted its probative value was not great.

After Dr. Tucker admitted he had considered defendant's religious beliefs along with all other aspects bearing on his mental state, the prosecutor asked if he was aware that a Satanic Bible had been found in defendant's car. Defense counsel's objections as to relevance and lack of foundation were overruled. Tucker replied that he had read transcripts of discussions about how the book got in the car and how long it had been there. He added that they "did talk about [defendant's] spiritual beliefs, which had nothing whatever to do with Satanism. But I don't think we discussed that particular book." Asked if he understood that defendant had possessed the book

"for some time," Tucker responded, "Yeah. Many years." The prosecutor then brought up the subject of tattoos and asked if Tucker was aware defendant had a tattoo of a Grim Reaper figure, but the court sustained defense objections to relevance, lack of foundation, and impermissible character evidence.

Defendant now argues Dr. Tucker's testimony about the Satanic Bible was irrelevant and unduly prejudicial, and its admission violated his constitutional rights to a fair trial and penalty as well as his rights to freedom of association, expression, and religion.[12]  Assuming defendant's relevance and foundation objections were sufficient to preserve his Evidence Code section 352 claim, it is not reasonably probable any error in admission of this testimony affected the verdict.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see also *People v. Partida* (2005) 37 Cal.4th 428, 436–437.)

---

[12]  To the extent defendant raises new arguments based on First Amendment, they were forfeited. (See *Doolin, supra,* 45 Cal.4th at p. 434.)  The failure to raise a constitutional violation in the trial court does not forfeit the argument on appeal if "it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 (*Boyer*).)  The evidentiary claim here is not of the first type, and defendant's First Amendment arguments invoke legal standards that are different than those presented to the trial court.

The jury was already aware from prior testimony that the book had been found in the trunk of defendant's car. That evidence was admitted without defense objection. Dr. Tucker did not talk about the book's contents and expressly refuted the suggestion that defendant held satanic beliefs. Nor is it apparent why the only new information Tucker conveyed about the volume, that defendant had owned it for "[m]any years," was particularly prejudicial. Defendant fails to explain why the jury might have considered such extended ownership to be more problematic than if the book had been a recent acquisition. The testimony was brief, and the topic was not mentioned in closing arguments. In contrast, the evidence of defendant's guilt was overwhelming. (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1208 [concluding any assumed error in references to Satanism and the Satanic Bible was harmless].) There was no dispute that defendant intentionally shot and killed Daly and Johnson and wounded other victims. Moreover, despite his methamphetamine consumption, defendant's behavior established significant evidence of premeditation. He took a shotgun from his uncle's friend then drove for some distance to Elk Grove, where boyfriends of his estranged wife lived. During the drive, he called his wife and friends to say goodbye, telling one friend, " 'Just watch the news tonight.' " His phone recorded his celebratory shouts of " 'woo' " during the shootings, and witnesses described him "strutting" and raising his arms in a V for victory gesture. He later told his wife in a recorded conversation that he "might have been a little, uh, over the edge, but I wasn't — [¶] . . . [¶] — totally." Compared to the considerable evidence that he committed two premeditated

murders and attempted others, it is not reasonably probable the brief mentions of this book could have affected the verdict.[13]

### 4. *Polling of Jury*

Near the end of the guilt phase, defense counsel noted that in the past two days there had been "some pretty inflammatory articles" in the Sacramento Bee. The first quoted from a letter defendant wrote his brother. Using an expletive to refer to the trial judge, defendant wrote, " 'I hope the — drowns.' " The second article described the hearing that addressed the permissible scope of Dr. Tucker's cross-examination. It quoted the prosecutor calling defendant a " 'sociopath' " who had abused animals as a child and adhered to satanic beliefs. It also discussed the prosecutor's desire "to bring in already excluded evidence about Dunn's four-year stint in the old California Youth Authority." Defense counsel acknowledged that the court had admonished jurors not to follow media coverage of the trial, but she asked that the jury be polled to ensure they had not read these two articles in particular. The court denied the request, explaining: "I'm not hearing there's a problem. I'm not going to

---

[13] In his reply brief, defendant argues for the first time that Dr. Tucker's brief testimony about the Satanic Bible was so inflammatory that it prejudiced the jury's penalty phase verdicts. "We need not, and typically do not, address arguments raised for the first time in a reply brief." (*People v. Wilson* (2023) 14 Cal.5th 839, 872, fn. 11.) In any event, given the circumstances of the crimes, including the callousness defendant displayed both during and after their commission, there is no reasonable possibility that any error in admission of this guilt phase testimony affected the penalty verdicts. (See *People v. Brown* (1988) 46 Cal.3d 432, 447–448; see also *People v. Boyce* (2014) 59 Cal.4th 672, 688–689.)

poll them to anticipate any problem. There's nothing that's come to my attention that suggests I need to do that."

Defendant challenges the ruling as an abuse of discretion. He argues, "If even one of the jurors was aware of the prejudicial publicity, there is a reasonable likelihood [defendant] did not receive a fair trial." The operative word in the assertion is "if." No evidence in this record suggests that any juror read the articles in question. There is no reason to think they would have, because the court instructed jurors repeatedly before every recess not to watch, read, or listen to any news reports or commentary about the case. Holding a hearing in the absence of need runs the risk of bringing otherwise unknown information to the jurors' attention, creating its own problems. "Absent a contrary indication in the record, it must be assumed the jury followed its instruction to avoid all publicity in the case." (*Pride*, *supra*, 3 Cal.4th at p. 226; see *Dennis*, *supra*, 17 Cal.4th at p. 542, fn. 17.) Defendant's suggestion otherwise is based on sheer conjecture.

We have previously rejected similar claims. In *Pride*, *supra*, 3 Cal.4th at page 226, the defendant asked to reopen voir dire or poll the jury about exposure to four new articles and a radio broadcast that had recently appeared. We upheld the court's denial of this request, noting jurors had been repeatedly admonished to avoid publicity about the case and there was no indication any juror had seen the new coverage. (*Ibid.*) We observed, "The court was not obliged to inquire into the matter based on mere speculation or conjecture that some impropriety had occurred." (*Ibid.*) Similarly, in *Dennis*, *supra*, 17 Cal.4th 468, we assumed jurors followed the often-repeated instruction to avoid media coverage about the case and held that mere speculation they may have seen a new article did not trigger a

duty for the court to inquire. (*Id.* at p. 542, fn. 17.) In *People v. Clark* (2011) 52 Cal.4th 856, 965 (*Clark*), the defense was concerned about a "near-daily barrage of newspaper articles" on two unrelated murders and anticrime sentiment. One local article featured a photograph of family members celebrating the guilty verdicts by dancing at the victim's gravesite. (*Ibid.*) The court denied a motion for a new jury and a request that the jurors be polled to determine if any had been prejudiced by recent media coverage. (*Id.* at pp. 965–966.) We upheld these rulings because counsel's assertion of bias was " 'entirely speculative' " (*id.* at p. 967) and nothing in the record suggested any juror had disregarded the court's admonition to avoid media coverage (*id.* at p. 968). Defendant argues these precedents do not apply because the articles in his case were more prejudicial and referred to inadmissible evidence. The salient point, however, is not the comparative content of the publicity but whether jurors were in fact exposed to it. As in *Pride*, *Dennis*, and *Clark*, there is no indication anyone on defendant's jury violated the court's repeated instructions and read the articles in question. In these circumstances, the court was under no duty to inquire about the matter, and it did not abuse its discretion in declining to do so.

Defendant urges us to adopt the approach of certain federal courts that require polling of the jury regarding publicity without a preliminary showing that any juror has been exposed to it. As *Clark* noted with respect to a similar argument, "This court is not bound by decisions of the lower federal courts." (*Clark, supra,* 52 Cal.4th at p. 967.) We adhere to our precedents in deferring to trial courts' discretion and assuming, absent evidence to the contrary, that jurors have followed the

instruction they are given throughout trial to avoid media coverage about the case.

### 5. *Defense Pinpoint Instruction*

Defendant claims the court abused its discretion and violated his constitutional rights by denying his request for a pinpoint instruction. The instruction was properly refused as an incorrect statement of law that could have led to confusion.

### a. *Background*

Expressing concern that the prosecution might rely on "some sort of transferred intent theory," defense counsel asked the court to give the following special instruction: "The fact, if you find it to be true, that the defendant formed the intent to kill Brian Clausen [*sic*] prior to the alleged commission of the crimes charged in the Information cannot be considered by you in determining whether the prosecution has proved each element of the alleged crimes as set forth in these instructions."

Defense counsel argued the instruction was needed because there was no temporal nexus between the victims in this case to support a theory of transferred intent. The court agreed but wondered if an instruction was necessary. The prosecutor stressed that he would not argue transferred intent. He explained that there was "certainly" evidence defendant wanted to kill his estranged wife's boyfriend, Brian Clauson, and that he planned to go to Elk Grove to do so. But the prosecution's theory was that defendant "got sidetracked en route and started doing other things that were separate and apart from" the intent to kill Clauson. The prosecutor argued that defendant's intent to kill Clauson reflected his planning and thought process and was relevant to dispute the defense theory that the crimes resulted from methamphetamine

psychosis. Defense counsel agreed this would be an "appropriate" use of the evidence. They sought the instruction, however, out of a concern the jury might misunderstand the argument and instead make findings based on transferred intent.

After taking the matter under submission, the court declined to give the requested instruction. Considering that the somewhat rare doctrine of transferred intent was not an issue in the case, the court believed calling attention to it in a special instruction was unnecessary and could lead to confusion.

Consistent with his representations, the prosecutor argued the evidence of defendant's planning to kill Brian Clauson showed clear and rational thinking, refuting Dr. Tucker's opinion that defendant was delusional. After discussing the expert's testimony, the prosecutor urged the jury to look to defendant's actions to understand what was "going on inside [his] head." "The defendant was feeling completely emasculated. I mean, his wife was cheating on him with a cop. And what did the screen saver say on his phone? 'All pigs die.' He's upset that his daughter is having to lie to him about Mommy's new man. He's felt that everyone has turned against him. He knows where Brian lives in Elk Grove. Is this psychosis? No way. [¶] Remember what he told the doctor? He said that his initial plan was to go find and kill Brian. Is that psychosis? 'Watch the news tonight.' "

Later, in addressing the element of premeditation and deliberation, the prosecutor argued: "The defendant does not think he's being threatened by police. That's ridiculous. We know he told the doctor that his plan was to go out there to find and kill Brian. [¶] Does that sound like somebody suffering

from paranoid delusions? He didn't take that gun for defensive reasons. We know that." The prosecutor described how defendant obtained a shotgun and got "nice and high" to give himself the courage "so that he can do what he's been planning to do all day. [¶] And where does he go? He goes to Elk Grove. It's time for Aaron Dunn to get even with this world that's dumped on him. So with his windows down and his Lynyrd Skynyrd blaring and his shotgun ready, Aaron Dunn is looking for opportunities. [¶] You don't fire a pump-action shotgun by accident. You saw the witness demonstrate what has to be done to fire that type of a weapon." The prosecutor reminded jurors how defendant yelled " 'woo!' " when he shot Daly: "This is exciting to him. He's getting his revenge. He's getting his power back. [¶] . . . He isn't suffering from paranoid delusions. He is unleashing his pent up hostility." The prosecutor argued defendant's premeditation for the murders began when he got a shotgun and drove around 50 miles to Elk Grove. As for whether he deliberated about the consequences, the prosecutor argued: "[R]emember, he told the doctor he wanted to go to Elk Grove because he wanted Brian. And he told the doctor, I figured I'd go to jail for killing Brian, but it would be worth it, to restore honor. Right? I mean, does that sounds like somebody that appreciates what he's about to do, knowing the consequences? Does he sound like somebody who is delusional? No way."

Defense counsel disputed this picture in her closing argument, maintaining instead that defendant acted "rashly or impulsively . . . because of his extreme meth intoxication and because he was suffering from . . . psychosis." Later, she explicitly cautioned jurors against improper use of the evidence about Clauson. First, she argued the evidence was conflicting about whether defendant intended to kill Clauson. Then she

sought to rebut any idea that "because . . . it looked like he premeditated and deliberated to kill Brian Clauson, therefore, you must believe that he intended to kill and premeditated and deliberated the killing of Mr. Daly and Mr. Johnson and the others." She argued such an inference was "absolutely forbidden by the law. That is not allowed. You may not use that evidence, if you believe it to be true, that Mr. Dunn intended to kill Brian Clauson, and premeditated and deliberated that act. You may not use that to determine if it's been proved beyond a reasonable doubt that he intended to kill Jon Johnson or Mike Daly or the other . . . victims here. That would be inappropriate. That would be against the law, which is a violation of your duties." Addressing defendant's statement to Dr. Tucker, counsel argued, "You're not here to decide whether [defendant] intended to kill Brian Clauson. And it's inappropriate for you to use that evidence, if it's true, as any evidence of the intent to kill or premeditation and deliberation on the crimes that are charged here." Finally, she asserted there was no evidence of premeditation unless jurors believed defendant had premeditated the murder of Clauson and "use[d] that [evidence] inappropriately." The prosecutor did not directly respond to the defense allusion to transferred intent in his rebuttal argument. He mentioned defendant's desire to "find and kill Brian" only as a fact that undermined Dr. Tucker's assertion that defendant had armed himself with a shotgun "for defensive purposes."

After closing arguments, defendant's attorneys renewed their request for a special instruction. Counsel argued the prosecutor's "references to the intent or premeditation to kill Brian got melded in with the argument that" defendant had premeditated the murders in this case. Although the defense closing had countered that suggestion, counsel believed an

instruction from the court "should back that up." The court declined, explaining it would have given the instruction if there was anything misleading in the prosecutor's argument, but "I did not hear anything that suggested to me that I should give that instruction."

### b. Discussion

"Pinpoint instructions 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.'" (*Scully, supra,* 11 Cal.5th at p. 592.) A proposed instruction is properly refused "if the instruction incorrectly states the law; is argumentative, duplicative, or potentially confusing; or is not supported by substantial evidence." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 53 (*Zaragoza*); see *People v. Moon* (2005) 37 Cal.4th 1, 30.)

The trial court properly declined to give defendant's proposed instruction because it was incorrect and would have risked confusing the jury. Defendant's proposed instruction was not a pinpoint instruction, which attempts to "relate particular facts to a legal issue in the case or 'pinpoint' the crux of [his] case." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) It was exactly the reverse. It told jurors that when "determining whether the prosecution has proved each element of the alleged crimes" they could *not* consider evidence that defendant decided to kill Brian Clauson. The instruction was overbroad and an incorrect statement of the law, because it would have prohibited the jury from considering whether defendant's acquisition of a shotgun and drive to Elk Grove to seek out Clauson negated the

defense theory that his actions were the result of a methamphetamine-induced psychosis.

Defense counsel were correct that transferred intent would not have been a valid theory here.  But it was neither offered nor alluded to.  The narrow transferred intent doctrine reflects a policy "that a defendant who shoots at an intended victim with intent to kill but misses and hits a bystander instead should be subject to the same criminal liability that would have been imposed had he hit his intended mark."  (*People v. Scott* (1996) 14 Cal.4th 544, 551.)  The evidence here did not support a transferred intent argument, nor would the jury have been tempted to conjure one on its own.  Defendant did not shoot at Brian Clauson or ever claim that he was doing so.  Nor was there any evidence that, in shooting at these victims, he was actually intending to shoot someone else but had missed.  The prosecutor did not urge the jury to draw a prohibited inference based on transferred intent.  Rather, the prosecutor discussed evidence about defendant's animus toward Clauson to show why he purposefully decided to arm himself and drive to Elk Grove.  These purposeful decisions undermined the defense theory that defendant was too psychotic to understand or control his actions.  Defendant raises no claim of impropriety related to the prosecution's argument.

The nature of the injuries and circumstances of the shootings are substantial evidence that defendant hit the very people at whom he was shooting.  Because the evidence did not support a transferred intent theory and the prosecutor's argument did not invoke it, defendant's proposed instruction was not supported by substantial evidence and was potentially confusing.  A court does not err in declining to give a pinpoint instruction that risks juror confusion (see *Scully*, *supra*, 11

Cal.5th at pp. 592–593) or distracts from the issues to be decided (see *Zaragoza, supra*, 1 Cal.5th at p. 55).

Finally, defendant now broadly asserts that the prosecution offered no evidence of intent or premeditation and the jury could have found these elements true only by relying on an improper theory of transferred intent. The assertion is belied by the record. As discussed (see *ante*, at p. 68), the jury heard significant evidence of premeditation unrelated to defendant's hostility toward Brian Clauson. The prosecution showed that defendant deliberately armed himself, fired devastating shotgun blasts at unarmed bystanders, and celebrated after hitting them. The evidence amply demonstrated that the murders were intentional, premeditated, and deliberate. The jury had no occasion to resort to an impermissible inference in making these findings. Furthermore, given the facts of the case and the extensive arguments of counsel on the subject, any error in the absence of an instruction related to transferred intent was harmless. (See *People v. Fudge* (1994) 7 Cal.4th 1075, 1111–1112; *Watson, supra*, 46 Cal.2d at p. 836.)

## C. *Penalty Phase Issues*

### 1. *Weapon Possession in Custody*

Defendant claims the court abused its discretion by admitting evidence that he possessed a weapon while incarcerated because it was not established that the item could be used as a weapon. The evidence was admissible.

Among other aggravating evidence permitted pursuant to section 190.3, factor (b), the prosecution offered evidence that defendant had been found in possession of an improvised weapon. Deputy Jarred Hailey testified in limine that on November 25, 2008, he searched defendant's county jail cell. On

defendant's bunk, Deputy Hailey found a piece of a plastic bag that had been filled with wet newspaper, wrapped tightly, and tied at the top with a string taken from a torn T-shirt. The string was "at least a foot or so" long, and the wad at the end was approximately the size of a fist. The object was hard and, in the deputy's opinion, could have been used as a weapon. For this reason, he recommended that defendant be cited for weapon possession. On cross-examination, Deputy Hailey agreed that inmates sometimes make a "fishing line" to transmit notes or objects between cells. A fishing line is typically "a pretty long string" with a small hard item affixed to one end that can be slid underneath the door into another cell. Hailey did not believe the item found on defendant's bunk was a fishing line because the hardened end could not have fit under the cell door. He agreed it could have fit through the door's meal slot if deputies failed to close it.

The court ruled the evidence admissible under section 190.3, factor (b). Based on the deputy's proffered testimony, it found that a reasonable juror could conclude defendant had possessed a weapon while incarcerated. (See § 4502, subd. (a).) At trial, Deputy Hailey testified that the string was "a foot or so" long and described the wadded newspaper as "not quite as hard as maybe a baseball, but pretty, pretty close to that." He believed the object was a weapon and confiscated it for that reason.

Under section 190.3, factor (b), the jury must consider the "presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." " '[E]vidence admitted under this provision must establish that the conduct was prohibited by a criminal statute and satisfied the essential

elements of the crime. [Citations.] The prosecution bears the burden of proving the factor (b) other crimes beyond a reasonable doubt.' [Citation.] The other crimes evidence may be conduct amounting to either a felony or a misdemeanor." (*Tully*, *supra*, 54 Cal.4th at p. 1027.)

Section 4574 prohibits any incarcerated person from possessing a "deadly weapon." (*Id.*, subd. (a).) Because many objects can be used for legitimate purposes, what matters for purposes of section 4574 is whether the item has the *potential* to inflict great bodily injury or death. (See *People v. Savedra* (1993) 15 Cal.App.4th 738, 744–745.) More specifically, section 4502 prohibits anyone confined in a penal institution from possessing or manufacturing any of a series of listed weapons, including "any instrument or weapon of the kind commonly known as a . . . slungshot." (§ 4502, subd. (a); see *id.*, subd. (b).) A "slungshot" is defined as "a striking weapon consisting of a heavy weight attached to a flexible handle." (*People v. Fannin* (2001) 91 Cal.App.4th 1399, 1406.) Earlier case law described the slungshot as " 'a small mass of metal or stone fixed on a flexible handle, strap or the like, used as a weapon.' " (*Id.* at p. 1402, quoting *People v. Williams* (1929) 100 Cal.App. 149, 151.)

The "trial court's decision to admit 'other crimes' evidence at the penalty phase is reviewed for abuse of discretion, and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient." (*Boyer*, *supra*, 38 Cal.4th at p. 477, fn. 51; see *Tully*, *supra*, 54 Cal.4th at p. 1027.) In this context, legally "sufficient evidence . . . means substantial evidence from which a reasonable jury could have found beyond a reasonable doubt that the defendant committed the uncharged crime." (*People v. Penunuri* (2018) 5 Cal.5th 126, 168.)

Substantial evidence review "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.)

Deputy Hailey's testimony was sufficient to meet this test. The dampened and wadded newspaper packed into a tight mass the size of a fist was almost as hard as a baseball. The affixed string would have allowed this hard object to be spun around and hurled at a person with force. Deputy Hailey considered the object to be a weapon, confiscated it as such, and cited defendant for its possession. Although the deputy conceded the object could also be used as a "fishing line" if jail deputies failed to close the cell door's meal slot, this concession went to the weight of the evidence, not its admissibility. "The trier of fact is free to consider any 'innocent explanation' for defendant's possession of the item, but such inferences do not render the evidence inadmissible per se." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 589.) Defendant also urges that the evidence was insufficient because the prosecution never produced a photograph or the object itself. Again, however, these arguments attack the weight of the evidence. The testimony of a sheriff's deputy experienced in identifying inmate-fashioned items can be sufficient to establish their admissibility as deadly weapons for purposes of section 190.3, factor (b). (See, e.g., *Steskal, supra*, 11 Cal.5th at p. 372.)

### 2. *Victim Impact*

Defendant raises two claims regarding the admission of victim impact evidence. First, he argues the amount of this evidence was so excessive and "gratuitous" that it violated his constitutional rights to due process and a reliable penalty trial. Second, he contends the court violated his constitutional rights by allowing the jury to hear a recording of Mike Daly performing a song he had written. The claims fail.

### a. *Quantity of Evidence*

Before the penalty phase, defendant moved in limine to limit victim impact evidence. The motion argued state and federal constitutional principles required that this evidence be limited to the impact on a family member who was personally present at the scene or immediately after the murder and must describe circumstances known or reasonably foreseeable to the defendant. It also urged that victim impact evidence be limited to testimony from the victim's next of kin. At a hearing on the motion, the prosecutor argued these limitations were not consistent with California law. Defense counsel conceded as much, observing, "The California interpretation of Factor A is vast and expansive." Specifically, in regard to the motion's assertion that permissible victim impact evidence was limited to a family member present at the scene, defense counsel again "acknowledge[d] that that's not the law" but presented the issues to preserve them for appellate review.

The court made no specific ruling on the motion, and defendant lodged no further objection to the amount of victim impact evidence offered. The prosecution presented testimony from eight witnesses: Mike Daly's sister, wife, and brother; Jon Johnson's sister, wife, best friend, and daughter; and Officer

Bestpitch.[14]  On appeal, defendant argues this volume of victim impact evidence was excessive and prejudicial.

"Evidence relating to a murder victim's personal characteristics and the impact of the crime on the victim's family is relevant to show the victim's ' "uniqueness as an individual human being" ' and thereby 'the specific harm caused by the defendant.' (*Payne v. Tennessee* (1991) 501 U.S. 808, 823, 825.) Under California law, such evidence is admissible as a circumstance of the crime under section 190.3, factor (a). (*People v. Edwards* (1991) 54 Cal.3d 787, 835; *People v. Russell* (2010) 50 Cal.4th 1228, 1264 . . . .)  Victim impact statements are, by their nature, emotional.  They merit exclusion only if they constitute such 'inflammatory rhetoric' as to elicit 'purely emotional or irrational responses from the jury.' (*People v. Simon* (2016) 1 Cal.5th 98, 138 . . . .)  We review a trial court's decision to admit victim impact evidence for abuse of discretion. (*Ibid.*)" (*People v. Spencer* (2018) 5 Cal.5th 642, 676–677 (*Spencer*).)

The amount of victim impact evidence here was similar to other cases we have considered and well within bounds of what has been held permissible.  The prosecution presented testimony from four witnesses about Johnson and three witnesses about Daly.  The sum of their testimony, along with

---

[14]  Beyond challenging the amount of victim impact evidence generally, defendant does not separately object to the testimony of Officer Bestpitch.  We have repeatedly held that permissible victim impact evidence in a capital trial is not limited to evidence relating to a deceased victim, and can include testimony from one who survives. (See *Johnsen, supra*, 10 Cal.5th at p. 1173; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1062–1063.)

that of Officer Bestpitch, consumed only part of an afternoon and covered 67 transcript pages. For comparison, we have upheld the presentation of nine (*People v. Brady* (2010) 50 Cal.4th 547, 573, 576–577), seven (*Spencer, supra,* 5 Cal.5th at pp. 677–678), and six witnesses for a single victim (*People v. Taylor* (2010) 48 Cal.4th 574, 646 (*Taylor*)), as well as 12 (*People v. Pearson* (2013) 56 Cal.4th 393, 464–466 (*Pearson*)), and eight witnesses for two victims (*People v. Verdugo* (2010) 50 Cal.4th 263, 296, 298 (*Verdugo*)).

Nor was any of the testimony improperly inflammatory or particularly apt to elicit an irrational response from the jury. "As in other cases, the witnesses here described the 'immediate effects' of the murders, as well as their 'residual and lasting impact.' " (*Verdugo, supra,* 50 Cal.4th at p. 298.) Witnesses properly described their relationship with the victim, how they learned about the crimes, and how they were affected by the murders. (See *People v. Mendez* (2019) 7 Cal.5th 680, 712 (*Mendez*).) Defendant points to no objectionable outbursts or unduly emotional content. Instead, he condemns the evidence generally as presenting improper " 'eulogies' " of the victims that appealed to jurors' emotions. But victim impact evidence appropriately offers jurors a picture of what the victim was like in life. (See *Payne v. Tennessee, supra,* 501 U.S. at p. 823 (*Payne*).) "Victim impact evidence is emotionally moving by its very nature, but that fact alone does not make it improper." (*Verdugo,* at p. 299.) The question is whether the testimony was "so emotional as to invite an irrational response." (*Winbush, supra,* 2 Cal.5th at p. 465; see *People v. Simon, supra,* 1 Cal.5th at p. 140 (*Simon*).) The testimony here conveyed the grief of family members and a friend and fell within the scope of victim impact evidence permissible under both the federal Constitution

and state law. (See *People v. Ramirez* (2021) 10 Cal.5th 983, 1027.)

Defendant renews his argument that permissible victim impact evidence is limited to the narrow factual context the United States Supreme Court considered in *Payne, supra,* 501 U.S. 808, which held the Eighth Amendment poses no bar to such evidence. Specifically, defendant asserts "that, to be consistent with *Payne* . . ., victim impact evidence must be limited to testimony from a *single* witness describing the murder's effect on a family member who was present at or immediately after the crime, and these effects must have been known or reasonably apparent to the defendant." We note the high court has not limited its precedent in such fashion. We have also repeatedly and unequivocally rejected such limitations. (See, e.g., *Winbush, supra,* 2 Cal.5th at p. 465; *People v. Garcia* (2011) 52 Cal.4th 706, 751; *People v. Pollock* (2004) 32 Cal.4th 1153, 1183.) We do so again. "The People are entitled to present a complete history of the murder victim's life and may also present testimony from loved ones who, sometimes vividly, describe the impact of their loss." (*Winbush*, at p. 465.) Victim impact witnesses need not be limited to family members. Such evidence may include, as here, effects upon the victim's friends. (See *Henriquez, supra,* 4 Cal.5th at p. 38; *Pearson, supra,* 56 Cal.4th at p. 467.)

Defendant contends the high court's decision in *Bosse v. Oklahoma* (2016) 580 U.S. 1 (*per curiam*) (*Bosse*) retreated from *Payne* and held that victim impact evidence is permissible only if presented by a family member who was present at the crime scene. Defendant misreads *Bosse.*

In *Payne*, the Supreme Court reconsidered its prior decision in *Booth v. Maryland* (1987) 482 U.S. 496, which had held that the Eighth Amendment prohibits consideration of victim impact evidence not "relate[d] directly to the circumstances of the crime." (*Booth*, at p. 507, fn. 10.) *Payne* overruled *Booth* to the extent that decision precluded the sentencing jury from considering "evidence about the victim and about the impact of the murder on the victim's family" in determining "whether or not the death penalty should be imposed." (*Payne*, *supra*, 501 U.S. at p. 827.) Quoting from dissenting opinions in *Booth* and a related opinion, the high court explained: " '[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' [Citation.] By turning the victim into a 'faceless stranger at the penalty phase of a capital trial,' [citation] *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder." (*Id.* at p. 825.)

The testimony in *Payne* described the victims and the impact of their loss on loved ones. The court expressly declined to address *Booth*'s related holding "that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." (*Payne*, *supra*, 501 U.S. at p. 830, fn. 2.) In *Bosse*, a state court had opined that *Payne* had " 'implicitly overruled' " this portion of *Booth* as well. (*Bosse*, *supra*, 580 U.S. at p. 2, italics omitted.) The high court

disagreed with this characterization of its holding. Noting that it alone held the power to overrule its precedents, the Supreme Court in *Bosse* held that "*Booth*'s prohibition on *opinions* about the crime, the defendant, and the appropriate punishment" remains valid. (*Id.* at p. 3, italics added; see *Taylor*, *supra*, 48 Cal.4th at pp. 646–647.) But this is all *Bosse* held. *Bosse* did not retreat from *Payne* or impose additional limits on the types of victim impact evidence that the federal Constitution permits. Defendant's reliance on *Bosse* is unavailing.

### b. *Recording of Victim Singing*

Defendant also challenges the playing of an audio recording of Mike Daly singing a song he had written. The song was played at the close of his brother David's testimony. David described Mike's lifelong love of music and listed several songs he played for Mike in the hospital during the final hours before Mike was removed from life support. He said the last song he played was one of Mike's own compositions, called "Horizon." The prosecutor displayed a photograph of Mike playing guitar and played a five-minute audio recording of Mike singing "Horizon."

Defense counsel objected below that a song performed by the victim himself did not fit within the definition of proper victim impact evidence. The court overruled the objection, explaining that victim impact evidence "relates to the victim's personal characteristics and to the crime's emotional impact on the victim's family." Defendant now challenges this ruling as an abuse of discretion that deprived him of due process and a fair penalty trial. We have routinely upheld the admission of audiovisual evidence about the victim and do so again here.

Initially, defendant faults the trial court for failing to listen to the song before admitting it. He did not raise this objection below, effecting a forfeiture. (See *Spencer, supra*, 5 Cal.5th at p. 677; *Simon, supra*, 1 Cal.5th at p. 139.) Before David's testimony, the prosecutor gave defense counsel a copy of the recording and the song's lyrics. After confirming that defense counsel had the copy, the court observed, "I can't imagine there's something in there, but if there is, I know you will bring it to my attention." Defense counsel said they would. The court reasonably relied on defense counsel's assurance. Although we have cautioned that trial courts should screen videotapes created for a victim impact presentation (see *Prince, supra*, 40 Cal.4th at p. 1289), we have not required such advance scrutiny for other types of victim impact evidence. Video evidence can be especially evocative, particularly when music or effects are added to enhance the impact of the photos or behavior of the victim in life. That is why special care must be taken to avoid the possibility of prejudice arising from this type of evidence. (See *ibid*.; see also *People v. Sandoval* (2015) 62 Cal.4th 394, 440–442.) Offered on its own, however, "music . . . does not raise the same concerns that arise in the context of a filmed tribute to the victim, set to music." (*Verdugo, supra*, 50 Cal.4th at p. 299.) Because the unique concerns about specially compiled and enhanced video evidence are not at play with a brief audio recording of the victim, the trial court did not err in accepting defense counsel's assertion that they would bring forward any particular concerns about the evidence.

Defendant next argues the recording was duplicative of David's testimony and so emotional as to provoke an irrational response in the jury. We disagree. The song gave jurors insight into what Mike Daly was like, and the recording allowed them

to hear from him in his own voice. (See *People v. Vines* (2011) 51 Cal.4th 830, 888 (*Vines*); *People v. Kelly* (2007) 42 Cal.4th 763, 798 (*Kelly*).) We have routinely upheld the admission of similar or even more emotionally evocative evidence. In *Verdugo*, for example, the prosecution offered into evidence and played "a 'few' songs" from a cassette tape of music the victim had compiled for her father shortly before her death. (*Verdugo*, *supra*, 50 Cal.4th at p. 299; see *id*. at pp. 298–299.) The evidence was permissible because it demonstrated the close bond between father and daughter. (*Id*. at p. 299.)

Previous decisions are consistent with this holding. In *Vines*, *supra*, 51 Cal.4th at page 888, the jury was shown a five-minute video of the victim "singing, dancing, and rapping in three musical numbers with relatives." This presentation was permissible because the video provided relevant insight into what the victim was like and contained no overly dramatic or contrived elements that could have diverted the jury from its proper function. (*Ibid*.; see also *Bell*, *supra*, 7 Cal.5th at pp. 128–129 [no error to show video of murder victim dancing at his wedding].) Similarly, in *Kelly*, *supra*, 42 Cal.4th at page 796, we found no prejudicial error in the admission of a 20-minute videotape consisting of a montage of still photographs and video clips of the victim's life. One clip showed the victim singing, both with a school group and alone, and included the song "You Light Up My Life." (*Ibid*.) In considering this evidence, we observed: "Music is not always impermissible. The portion of the videotape showing Sara's singing performance seems relevant to the purpose of demonstrating what she was like. It reflects her demeanor in the difficult situation her mother described — a shy girl performing solo before her classmates. Her choice of song to sing at that age and in those circumstances also seems

relevant to forming an impression of the victim. Her musical performance was not excessively emotional." (*Id.* at p. 798.) We distinguished the victim's own performance, which was relevant and permissible, from the background music added elsewhere in the video, which "may have added an irrelevant factor to the videotape." (*Ibid.*)

The song here, written and performed by the victim, offered relevant evidence of his " 'uniqueness as an individual human being' " that was appropriate for the jury to consider at the penalty phase. (*Payne, supra*, 501 U.S. at p. 823.) The recording included no later-added dramatic effects that might have injected irrelevant information or distracted the jury from its proper role. Nor were the lyrics especially evocative or troubling. Defendant suggests they might refer to death, but read as a whole they seem to describe a person who has moved on after the end of a love affair. In any event, we have upheld the admission of victim impact evidence that more frankly addressed the topic of death. For example, in *Mendez, supra*, 7 Cal.5th at page 711, the victim's mother read a poem the victim had written as a fifth grader bemoaning deaths from gang violence. Despite the "cruel irony" of that content, we concluded the poem did not invite an irrational response from the jury that would have required its exclusion. (*Id.* at p. 714.) And in *People v. Ramirez, supra*, 10 Cal.5th at page 1022, we held the court did not err in admitting a short story the victim had written about finding a recently deceased newborn in a garbage can. The story was "moving" but also "probative of [the victim's] character." (*Id.* at p. 1028.) "Nor [could] we say that the story was cumulative of the live witnesses' testimony; it was through the story only that the jury heard directly from the victim himself, contrasted with hearing *about* him." (*Ibid.*) The same

was true here of Mike Daly's song, and the court did not err in admitting it.

### 3. *Challenges to Death Penalty Statute*

Defendant raises several challenges to the constitutionality of California's death penalty statutes. Though acknowledging that we have previously rejected these claims, he urges their reconsideration. We adhere to our settled precedents, which hold:

The class of murders eligible for the death penalty under section 190.2 is not impermissibly broad. (*People v. Helzer* (2024) 15 Cal.5th 622, 677 (*Helzer*); *People v. Camacho* (2022) 14 Cal.5th 77, 148 (*Camacho*).)

Section 190.3, factor (a), which permits aggravation based on the circumstances of the crime, does not result in the arbitrary and capricious imposition of death. (*People v. Tran* (2022) 13 Cal.5th 1169, 1236 (*Tran*); *People v. Gonzalez* (2021) 12 Cal.5th 367, 416 (*Gonzalez*).)

The selection of death-qualified jurors does not violate due process or the right to an impartial jury. (*Poore*, *supra*, 13 Cal.5th at pp. 299–300; *Taylor*, *supra*, 48 Cal.4th at pp. 602–603.)

"As we have often explained, the jury's penalty choice is a normative decision, not a factual one." (*Poore*, *supra*, 13 Cal.5th at p. 309.) Accordingly, the death penalty scheme in California is not unconstitutional for failing to require written findings (*Gonzalez*, *supra*, 12 Cal.5th at p. 417); unanimous findings as to the existence of aggravating factors or unadjudicated criminal activity (*Camacho*, *supra*, 14 Cal.5th at p. 149); or findings beyond a reasonable doubt as to the existence of aggravating factors (other than § 190.3, factor (b) or (c) evidence), that

aggravating factors outweigh mitigating factors, or that death is the appropriate penalty (*Helzer*, *supra*, 15 Cal.5th at p. 678; *People v. Mataele* (2022) 13 Cal.5th 372, 435 (*Mataele*)).  The high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Hurst v. Florida* (2016) 577 U.S. 92, do not alter these conclusions.  (*Gonzalez*, at p. 416;  *People v. McDaniel* (2021) 12 Cal.5th 97, 155–156 (*McDaniel*).)

Jurors need not be instructed that statutory mitigating factors are relevant only for mitigation.  (*Helzer*, *supra*, 15 Cal.5th at p. 678; *People v. Parker* (2022) 13 Cal.5th 1, 91.)

California's capital sentencing scheme does not violate international law, the federal Constitution, or evolving standards of decency.  (*Tran*, *supra*, 13 Cal.5th at p. 1236; *Mataele*, *supra*, 13 Cal.5th at p. 436.)

"Finally, 'considering the arguments in combination, and viewing the death penalty law as a whole, it is not constitutionally defective.  Defendant's challenges to California's death penalty scheme "are no more persuasive when considered together," than when considered separately. [Citation.]  "California's capital sentencing scheme as a whole provides adequate safeguards against the imposition of arbitrary or unreliable death judgments." ' "  (*Poore*, *supra*, 13 Cal.5th at p. 310.)

## D.  Cumulative Error

Defendant asserts that cumulative prejudice resulting from errors in the guilt and penalty phases requires reversal of the judgment.  We found assumed error in the admission of Satanic Bible evidence to be harmless.  We rejected some other claims for lack of prejudice but separately concluded the claims

lacked merit. Accordingly, there are no errors or prejudice to accumulate, and defendant's cumulative error claim necessarily fails. (See *Gonzalez, supra,* 12 Cal.5th at p. 417; *McDaniel, supra,* 12 Cal.5th at p. 157.)

## III. DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Dunn

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S184521
**Date Filed:** July 24, 2025

_____

**Court:** Superior
**County:** Sacramento
**Judge:** Michael W. Sweet

_____

**Counsel:**

Dennis C. Cusick, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Ronald S. Matthias, Assistant Attorney General, Sean M. McCoy and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Dennis C. Cusick
Attorney at Law
3053 Freeport Boulevard, #124
Sacramento, CA 95818
(916) 743-7358

Kari Ricci Mueller
Deputy Attorney General
1300 I Street
Sacramento, CA 95618
(916) 210-7731